[No. A132586. First Dist., Div. One. Nov. 29, 2012.]

CITY OF PLEASANTON et al., Plaintiffs and Respondents, v.
BOARD OF ADMINISTRATION OF THE PUBLIC EMPLOYEES'
RETIREMENT SYSTEM, Defendant and Appellant.

COUNSEL

Reed Smith, Harvey L. Leiderman and Jeffrey R. Rieger for Defendant and Appellant.

Jonathan P. Lowell, City Attorney, and Michael H. Roush, Special Counsel, for Plaintiffs and Respondents.

OPINION

**MARGULIES, J.**—The City of Pleasanton (Pleasanton) and a retired Pleasanton employee, James Linhart, petitioned for a writ of mandate to compel California's Public Employees' Retirement System (PERS) and its Board of Administration (board) to retroactively increase Linhart's monthly retirement allowance. Linhart contended the board erred in determining a portion of his compensation as a division chief for the Livermore-Pleasanton Fire Department was not pensionable. The trial court agreed and entered a judgment directing PERS to increase Linhart's monthly pension allowance retroactively from the date of his retirement in 2006. We reverse the judgment and remand the matter back to the trial court for entry of a new judgment denying the petition.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. *Factual Background*

Linhart joined the Pleasanton Fire Department in 1984. Due to his employment he became a local safety member of PERS. After being promoted to fire captain in 1992, Linhart became a division chief in 1998, when the Pleasanton and Livermore fire departments merged. Linhart retired at the rank of division chief in 2006, after 22 years of service, and began receiving a retirement

allowance from PERS. The central issue in this case is whether a portion of Linhart's compensation as division chief, denominated "standby pay" in his labor agreement, should be considered part of his pensionable earnings for purposes of calculating his monthly PERS retirement allowance.

As a fire captain in Pleasanton before the merger, Linhart worked a 56-hour workweek: 24 hours on followed by 24 hours off, two times, followed by 24 hours on and four days off. Linhart and others on the 56-hour workweek received an additional 7.5 percent of salary as "in lieu" holiday pay to compensate them for the fact their shift pattern required them to work on holidays. Until 1994, battalion chiefs worked the same 56-hour workweek and, like line personnel, received an additional 7.5 percent of salary as "in lieu" holiday pay. However, in that year, battalion chiefs were moved from the 56-hour workweek to a normal 40-hour workweek, 8:00 a.m. to 5:00 p.m., Monday through Friday. As a result of this change in schedule, battalion chiefs were no longer paid in lieu holiday pay. To avoid a reduction in their pay, Pleasanton chose to raise battalion chief salaries by 7.5 percent.

At the time of the merger in 1998, the Livermore Fire Department included a management classification of division chief. A division chief worked a modified 56-hour workweek. In general, the division chief worked the same schedule as his platoon but, when his platoon was at the station after 5:00 p.m., the division chief was allowed to go home and remain on call. Division chiefs in the Livermore Fire Department received in lieu holiday pay, like their management counterparts in the Pleasanton Fire Department had received prior to 1994.

The Livermore-Pleasanton Fire Department was formed in 1998, or shortly before. Pleasanton's battalion chiefs became division chiefs in the merged department. Linhart was promoted to division chief and given the position of training division chief, which he held until his retirement. The new department adopted an "Interim Compensation Plan" under which "Operations Division Chiefs"—division chiefs who supervised and managed an operations division—were assigned a modified 56-hour workweek like that worked by Livermore division chiefs before the merger.

Under the Interim Compensation Plan, Linhart was not assigned a modified 56-hour workweek. He worked a 40-hour workweek, 8:00 a.m. to 5:00 p.m., Monday through Friday, and was off work on the city's 12 annual observed holidays. However, he was assigned to a "back-up schedule" which required

him to be available to report for emergencies, as necessary, during certain times. Linhart's backup schedule applied only to him and to the chief and deputy chief of the department. He occasionally filled in for operations division chiefs when they were ill, injured, or on vacation, in which case he would work the modified 56-hour schedule of the officer for whom he was filling in. On those occasions, or when he was required to respond to emergencies on the backup schedule, he would sometimes work on holidays. When required by the press of work, Linhart worked additional hours beyond his 40-hour workweek.

Section 5.1 of the Interim Compensation Plan, entitled "Standby Pay," provided in relevant part as follows: "Division Chiefs assigned to a standby schedule shall be compensated in an amount equal to seven and one-half percent (7.5%) of the Division Chief control point listed in Appendix A.[1] Standby pay shall be paid biweekly." The standby pay provision remained in effect through revised compensation plans and Linhart continued to receive standby pay under it until his retirement in 2006.

Under the Public Employees' Retirement Law, Government Code[2] section 20000 et seq. (PERL) and PERS regulations, a PERS member's benefits are determined according to a statutory formula that takes into account the member's base salary and certain items of special compensation received during the year in which the member's compensation is highest. Not all items of compensation paid in addition to the member's base salary count as pensionable special compensation. To qualify as special compensation, the payment must be received (1) "for special skills, knowledge, abilities, work assignment, workdays or hours, or other work conditions"; (2) "pursuant to a labor policy or agreement" applicable to a group or class of similarly situated employees; (3) "for services rendered during normal working hours." (§ 20636, subd. (c)(1), (2), (3).) Further, pensionable special compensation includes only payments the PERS board has "affirmatively determined to be special compensation," as reflected in board regulations promulgated for that purpose. (§ 20636, subd. (c)(6), (7); Cal. Code Regs., tit. 2, § 571, subds. (a), (d) (Regulation 571).) An item of special compensation not listed in subdivision (a) of Regulation 571 cannot be used in determining a member's final compensation for pension purposes. (Reg. 571, subd. (d).)

From 1998 to 2006, Pleasanton made PERS contributions on behalf of six public safety employees, including Linhart, calculated by including standby pay they received as pensionable special compensation. Pleasanton and the employees believed the employees' retirement benefits would, in part, be

---

[1] The control point was the midpoint of the salary grade for division chiefs, which was $6,600 per month at the inception of the Interim Compensation Plan in 1998.

[2] All further statutory references are to the Government Code unless otherwise indicated.

based on standby pay. PERS itself never made any representation to that effect to them. Although PERS has a procedure for alerting contracting public agencies when there are discrepancies in the member earnings and retirement contributions reported to PERS, no such report was generated in this case.[3]

PERS first became aware standby pay was included in Linhart's reported base pay in July 2006. On July 24, 2006, PERS's payroll processing unit informed Pleasanton standby pay was not reportable compensation for retirement purposes and that payroll reporting for Linhart had to be corrected to exclude it. Although the estimate Pleasanton provided Linhart of his retirement allowance in 2006 included standby pay as part of his pensionable final compensation, there is no evidence PERS ever represented to Linhart that his pension benefit would be calculated by including standby pay as part of his final compensation. None of the other similarly situated Pleasanton employees who retired before Linhart received PERS pension benefits based on the inclusion of standby pay.

## B. *Administrative Proceedings*

After initially acceding to PERS's position that standby pay was not includable as compensation for retirement purposes, Pleasanton requested PERS to reconsider that determination in June 2007. After PERS affirmed its original position, Pleasanton initiated an administrative appeal on behalf of itself and several retired former employees in November 2007, asserting PERS was refusing to pay the concerned retirees "the retirement benefits to which they are entitled."

The appeal was assigned for hearing to an administrative law judge (ALJ) under the auspices of the Office of Administrative Hearings (OAH).[4] (See § 20134 [requiring this procedure when the PERS board hears appeals of benefit determinations]; § 11517, subd. (a) [authorizing the use of ALJ's to conduct original hearings on contested matters]; Cal. Code Regs., tit. 2, § 555 et seq. [specifying procedures for administrative appeal of PERS decisions].) The OAH is part of the Department of General Services, a state agency that is independent of PERS. (§ 11370.2, subd. (a).) In that contested proceeding, Pleasanton and Linhart were represented by Michael Roush, special counsel

---

[3] Pleasanton did not separately report standby pay to PERS as special compensation under a separate code, as it was supposed to do. Instead, it reported an amount of biweekly earnings for Linhart that was higher, by the amount of his standby pay, than the product of his reported hourly payrate of $56.054 (in his final year) multiplied by 80 hours. However, PERS acknowledges this arithmetical discrepancy should have triggered a discrepancy report that PERS would have shared with Pleasanton.

[4] With OAH's concurrence, the hearing was limited to the Linhart case with the expectation that the outcome of the case would provide a frame of reference for addressing the remaining cases.

for Pleasanton, and PERS was represented by Patricia Miles, a senior staff counsel at PERS.[5] An evidentiary hearing was held before the ALJ on September 15 and 16, 2009. Linhart and PERS called and cross-examined witnesses, introduced documentary evidence, and submitted written opening and closing arguments to the ALJ in accordance with the hearing procedures of the California Administrative Procedure Act (APA). (See § 11400 et seq.)

The ALJ issued a proposed decision on December 24, 2009, finding Linhart's standby pay "was not special compensation, because it was paid for services rendered outside of his normal working hours." The ALJ also concluded the payments could not be construed as holiday pay, training premium pay, or shift differential pay, which PERS has determined, in general, to be special compensation in Regulation 571. (Reg. 571, subd. (a)(4), (5).) Further, the ALJ rejected Linhart's arguments that PERS breached its fiduciary duty to him and/or should be estopped by its conduct from excluding his standby pay from his pension calculation. The ALJ found (1) no breach of duty because Pleasanton was in at least as good a position as PERS to discover it was misreporting Linhart's compensation, and (2) no estoppel because PERS never represented to Linhart standby pay would be included in his pension calculation. The ALJ accordingly issued a proposed decision denying Linhart's appeal.

In accordance with section 11517, subdivision (c), the ALJ's proposed decision was timely submitted to the board for a determination whether to adopt the ALJ's decision or take any of the other actions allowed by that subdivision.[6] The matter was originally set for public hearing on February 18, 2010. In conjunction with that hearing, PERS staff submitted a packet of materials to the board members, a copy of which was received by Linhart's counsel on February 16. In addition to a copy of the ALJ's proposed decision, the packet included (1) a cover memorandum signed by Patricia Miles stating in relevant part, "Staff recommends that the Board of Administration adopt the Proposed Decision" and neutrally spelling out all of the board's options for responding to the proposed decision; (2) a two-page, single-spaced document entitled, "STAFF'S ARGUMENT TO ADOPT THE PROPOSED DECISION," which summarized the evidence presented to the ALJ, the positions of the parties, and the ALJ's proposed decision, and recommended the board adopt the proposed decision because it was "consistent with the law and the facts"; and (3) a six-page, double-spaced document entitled,

---

[5] For ease of reference, we will refer to the respondents in that proceeding collectively as Linhart.

[6] The APA also authorizes the board, among other options, to reject the decision and refer the matter back to the ALJ to take additional evidence, or to decide the matter itself based on the record of the original ALJ hearing without taking additional evidence. (§ 11517, subd. (c)(2).)

"RESPONDENTS' ARGUMENTS TO REJECT THE PROPOSED DECI-SION," prepared by Linhart's counsel, Michael Roush, which contended the ALJ's factual findings were not supported by the evidence, his legal conclusions were not supported by the findings or the evidence, and his proposed decision should be rejected by the board.

After receiving the agenda materials to be provided to board members on February 16, Michael Roush wrote to the board complaining the cover memorandum and recommendation by Patricia Miles was improper because she was the same attorney who had represented PERS in the administrative hearing before the ALJ. Roush asserted this violated Linhart's due process rights. Following postponement of the hearing until March 17, PERS's assistant chief counsel responded to Roush's letter, explaining why the legal department believed his due process claim was misplaced. Roush wrote back, responding to the authorities cited in the legal department's letter.

Roush was present at the PERS board meeting on March 17, 2010, when the board took up the ALJ's proposed decision in Linhart's case. He addressed the board to express concern that none of his correspondence concerning the due process issue had been made part of the agenda materials presented to the board, and to seek a continuance of the Linhart matter so board members would have a chance to read those letters before it decided the case. Following the advice of its chief legal counsel that the due process issue was not before the board, the board voted to adopt the ALJ's proposed decision.

Linhart petitioned the board for reconsideration on the grounds his due process rights had been violated because PERS had not properly separated its "adjudicative" function from its "investigative, prosecutorial and advocacy" functions. He argued the only adequate remedy was for the board to grant him the relief he sought in the underlying administrative appeal. The board voted unanimously to deny the petition.

## C.  *Trial Court Proceedings*

Linhart petitioned the trial court for a peremptory writ of administrative mandamus directing the board to set aside its decision and issue a new decision recalculating his future retirement benefits and awarding him a retroactive payment based on the inclusion of standby pay as part of his pensionable compensation. The trial court bifurcated the matter into two

phases, first taking up petitioner's due process claims, followed by his substantive claims regarding the PERS board decision. In phase 1, the court ruled Linhart's due process rights had been violated "when attorney Patricia Miles acted as both the prosecutor in the hearing on Linhart's claim to benefits before the hearing officer designated by the agency, and as the advising staff person from the agency to its Board when the Board made the final adjudicatory decision." As a remedy for the due process violation, the court determined it would review the administrative evidentiary record developed before the ALJ on a de novo basis rather than defer to the board's findings to the extent they were supported by substantial evidence, as the court believed would normally be required by Code of Civil Procedure section 1094.5, subdivision (c).

On Linhart's substantive claims, the trial court ruled PERS should have included Linhart's biweekly standby pay as part of his pensionable compensation. The court held the payments in issue qualified under several categories of special compensation listed in Regulation 571, including "Training Premium," "Holiday Pay," "Management Incentive Pay," "Off-Salary-Schedule Pay," or "Shift Differential," and also qualified as part of Linhart's "base salary" under section 20636.

PERS timely appealed from the ensuing judgment.

## II.  DISCUSSION

PERS contends the trial court erred in (1) finding a due process violation and reviewing the administrative record de novo; and (2) holding the payments in issue came within any category enumerated in Regulation 571, much less that they qualified under multiple categories. PERS further contends Linhart is not entitled to relief based on the theory PERS breached a fiduciary duty to him or should be estopped from denying him pension benefits based on standby pay.

### A.  Due Process

We independently review Linhart's claim the board failed to afford him a fair hearing. (*TWC Storage, LLC v. State Water Resources Control Bd.* (2010) 185 Cal.App.4th 291, 296 [110 Cal.Rptr.3d 270].)

■ The trial court erred in finding a due process violation in this case. Linhart's case would not have been before the board for decision unless agency staff and Linhart had taken conflicting positions and the matter had gone to an ALJ. It would therefore come as no surprise to board members that agency staff recommended approving an ALJ decision upholding the staff's original decision. As long as both sides' arguments on the issue were

presented to the board at the same time, no agency staff involved in handling Linhart's appeal voted or acted in any supervisory capacity over voting members on the board itself, and there were no ex parte contacts between agency staff and board members about the decision, we perceive no due process problem.

■     There are two important factors to note at the outset of our analysis. First, the decisionmaking body in this case was not composed of, beholden to, or dependent on the staff of the agency. All 13 of the PERS board's members are selected by persons outside the agency, including six who are elected by PERS's active and retired members. (§ 20090.)[7] Second, the trial court made no finding Attorney Sarah Miles had any ex parte communications with any board member or board member staff or designee concerning the substance of Linhart's appeal, and no such claim is before us on this appeal. The sole issue is whether the submission to the board of a written "staff recommendation" and analysis prepared by Miles—done simultaneously with the submission of written arguments prepared by Linhart's counsel—violated Linhart's due process rights.

In holding it violated Linhart's due process rights for Attorney Miles to serve as both PERS's "prosecutor" at the hearing before the ALJ and as "the advising staff person" from the agency to the board, the trial court principally relied on *Department of Alcoholic Beverage Control v. Alcoholic Beverage Control Appeals Bd.* (2006) 40 Cal.4th 1 [50 Cal.Rptr.3d 585, 145 P.3d 462] (*ABC*) and *Nightlife Partners, Ltd. v. City of Beverly Hills* (2003) 108 Cal.App.4th 81 [133 Cal.Rptr.2d 234] (*Nightlife*). According to the court, these cases stand for the principle that an advocate for the agency position in a contested administrative proceeding, such as Attorney Miles in this case, cannot properly offer advice or recommendations to the agency's adjudicative tribunal when it determines the appeal. The court specifically rejected PERS's position that the sole purpose of this rule is to prevent *ex parte communications* between the prosecution and the decision maker or its delegees. While the trial court acknowledged *ABC* was primarily concerned with ex parte communications, it found the cases recognized a separate problem with the blending of prosecutorial and adjudicative functions in that, in the trial court's words, it "gives rise to an appearance of a lack of objectivity or neutrality."

---

[7] By statute, four of the board members are the heads of or are on the governing board of other agencies: one member of the State Personnel Board, the director of the Department of Human Resources, the Controller, and the State Treasurer. The Governor appoints two members who are, respectively, an official of a life insurance company and an elected official of an agency that contracts with PERS. The Legislature appoints one board member to represent the public. The other six board members are elected by active and/or retired PERS members. (§ 20090.) Board members serve four-year terms. (§ 20095.)

In our view, the trial court misconstrued *ABC*. The issue before the court in *ABC* was whether the APA "permit[s] *ex parte contacts* between an agency's prosecutor and its ultimate decision maker or his or her advisers about the substance of the case, prior to the ultimate decision maker rendering a final decision." (*ABC, supra*, 40 Cal.4th at p. 8, italics added.) In one introductory passage of the *ABC* opinion, which the trial court quoted and relied on, the *ABC* court summarizes key precepts of the APA as follows: "While the state's administrative agencies have considerable leeway in how they structure their adjudicatory functions, they may not disregard certain basic precepts. One fairness principle directs that in adjudicative matters, one adversary should not be permitted to bend the ear of the ultimate decision maker or the decision maker's advisers in private. *Another directs that the functions of prosecution and adjudication be kept separate, carried out by distinct individuals. California's [APA] [citation] . . . adopts these precepts by regulating and strictly limiting contacts between an agency's prosecutor and the officers the agency selects to preside over hearings and ultimately decide adjudicative matters.*" (*ABC, supra*, 40 Cal.4th at p. 5, italics added, fn. omitted.)

Later in the opinion, the Supreme Court clarified it was not endorsing a rule prohibiting all prosecutor-decision maker contact: "The Department and Attorney General express concern that a rule precluding prosecutor-decision maker contact will have dramatic consequences for this and other agencies, requiring agencies to split and depriving agency heads of the advice of their subordinates. Nothing about our interpretation of the APA requires splitting this agency or any other. The Department may still function as a unitary agency. In doing so, however, it must afford licensees fundamentally fair hearings by observing a limited internal separation of functions. *The agency head is free to speak with anyone in the agency and to solicit and receive advice from whomever he or she pleases—anyone except the personnel who served as adversaries in a specific case.* [Citations.] . . . *Virtually the only contact that is forbidden is communication in the other direction: a prosecutor cannot communicate off the record with the agency decision maker or the decision maker's advisers about the substance of the case.* But the one contact that is forbidden is the one contact that occurred here." (*ABC, supra*, 40 Cal.4th at pp. 16–17, italics added, fns. omitted.) As we read this passage from *ABC*, the Supreme Court is saying that under the APA the agency decision maker cannot properly solicit or receive *private, ex parte* advice from the personnel who served as adversaries in the case. It is *not* saying the agency decisionmaking body is precluded from soliciting or receiving a written analysis and recommendation from the agency's prosecuting attorney delivered to it as part of a public agenda packet along with the adversary's opposing analysis and recommendation.

Any doubt about the intended meaning or application of the foregoing passage from *ABC* is removed by considering the remedy the Supreme Court required in the case. The Department of Alcoholic Beverage Control procedure challenged was that the department's prosecutor would prepare a "report of hearing" following license-revocation proceedings before an ALJ which would be sent to the department's chief counsel—but not to the licensee— before the department made its final decision whether to approve or reject the ALJ's decision. (*ABC, supra,* 40 Cal.4th at p. 6.) The report summarized the issues and evidence presented at the hearing and recommended, with supporting reasons, a particular disposition of the case. (*Ibid.*) Despite finding this procedure violated the APA, the Supreme Court specifically rejected the option of barring the future preparation or use of such reports: "[T]he further remedy ordered by the Court of Appeal—mandatory screening procedures barring prosecutor-decision maker contacts and precluding use of reports of hearing in future cases—is overbroad. *The APA bars only advocate-decision maker ex parte contacts, not all contacts.* Thus, for example, *nothing in the APA precludes the ultimate decision maker from considering posthearing briefs submitted by, and served on, each side. The Department if it so chooses may continue to use the report of hearing procedure, so long as it provides licensees a copy of the report and the opportunity to respond.*" (*ABC,* at p. 17, italics added.) In our view, the procedure followed here is indistinguishable from the procedure the Supreme Court found proper in *ABC.*

Barring the type of communication that occurred here would make little practical sense. Should the board receive only the administrative appellant's analysis and recommendation? That would give an undue advantage to administrative appellants. Should it receive only the ALJ's decision without argument or explanation by *either* side as to why it should be approved or rejected? That would deprive the board of essential information it needs to fairly evaluate the ALJ's decision. Or should the agency be required to utilize a separate, independent staff unit that is unfamiliar with the appeal to review the issues and the administrative record and provide it with an objective analysis and recommendation? Not only would the latter requirement constitute "splitting" the agency, which the Supreme Court in *ABC* found unnecessary, but it would also duplicate the function already served by having an independent ALJ hear evidence and render a decision.

In *Morongo Band of Mission Indians v. State Water Resources Control Bd.* (2009) 45 Cal.4th 731 [88 Cal.Rptr.3d 610, 199 P.3d 1142] (*Morongo*), the Supreme Court emphasized that it takes a practical approach in construing due process rights in an administrative context, and presumes adjudicators are not biased absent evidence to the contrary: "In construing the constitutional due process right to an impartial tribunal, we take a more practical and less pessimistic view of human nature in general and of state administrative agency adjudicators in particular. In the absence of financial or other personal

interest, and when rules mandating an agency's internal separation of functions and prohibiting ex parte communications are observed, the presumption of impartiality can be overcome only by specific evidence demonstrating actual bias or a particular combination of circumstances creating an unacceptable risk of bias. Unless such evidence is produced, we remain confident that state administrative agency adjudicators will evaluate factual and legal arguments on their merits, applying the law to the evidence in the record to reach fair and reasonable decisions." (*Id.* at pp. 741–742 [holding there is no due process violation when the agency's attorney prosecuting the matter had served in an advisory capacity to the board on an unrelated matter].) Where, as in this case, the board members deciding Linhart's appeal come from diverse sources outside the agency, including persons elected by active and retired PERS members, the risk of bias in favor of agency staff would seem particularly low.

*Nightlife*, cited by the trial court, also does not support its due process ruling. The facts in *Nightlife* were that an assistant city attorney who had represented the city in federal litigation against a local cabaret offering adult entertainment was used as a legal adviser to the decision maker throughout a hearing on the cabaret's appeal of the city's decision to revoke its permit. (*Nightlife, supra,* 108 Cal.App.4th at pp. 84–85.) The decision maker announced at the outset of the hearing that he had never presided at such a hearing before, and would therefore have the assistant city attorney advising and assisting him in the proceeding. (*Id.* at p. 85.) The two conferred in private from time to time during the hearing, apparently concerning evidentiary rulings and legal issues. The cabaret's appeal was denied. (*Ibid.*) These facts are very far removed from what occurred in this case. Attorney Miles did not sit with the board or its presiding officer and give legal advice to them in private as they heard or voted upon Linhart's appeal or motion for reconsideration, or at any other time.

In finding a due process violation on the rather egregious facts of that case, the *Nightlife* court relied in part on a provision of the APA, section 11425.30, which specifies how an administrative agency's "adjudicative functions" must be separated from "the investigative, prosecutorial, and advocacy functions within the agency." (*Nightlife, supra,* 108 Cal.App.4th at pp. 91–93; see §§ 11425.10, subd. (a)(4), 11425.30.) The trial court specifically relied on this principle of separation of functions to conclude there had been a due process violation in this case. The relevant portions of section 11425.30 are instructive: "(a) A person may not serve as presiding officer in an adjudicative proceeding in any of the following circumstances: [¶] (1) The person has served as investigator, prosecutor, or advocate in the proceeding or its preadjudicative stage. [¶] (2) The person is subject to the authority, direction, or discretion of a person who has served as investigator, prosecutor, or advocate in the proceeding or its preadjudicative stage. [¶] . . . [¶] (c) The

provisions of this section governing separation of functions as to the presiding officer also govern separation of functions as to the agency head or other person or body to which the power to hear or decide in the proceeding is delegated." In other words, the agency's prosecutor or advocate against the administrative appellant cannot preside over the appeal and the person or persons who do preside cannot be subject to that advocate's authority, direction, or discretion. Nothing whatsoever of that nature occurred in this case.

■ In sum, due process in the handling of an administrative appeal does not in general preclude the advocate for the agency staff's position from communicating with and making recommendations to the agency decision maker or the decision maker's advisers about the substance of the matter as long as (1) no part of the communication is made ex parte, (2) the administrative appellant is simultaneously afforded at least the same opportunity to communicate with the decision maker as the staff advocate, and (3) the decision maker is not subject to the advocate's authority or direction. We find no other evidence in the record suggesting bias on the part of the board or the presence of a situation " 'in which experience teaches that the probability of actual bias . . . is too high to be constitutionally tolerable.' " (*Morongo, supra*, 45 Cal.4th at p. 737, quoting *Withrow v. Larkin* (1975) 421 U.S. 35 at p. 47 [43 L.Ed.2d 712, 95 S.Ct. 1456].)

For these reasons, we find the trial court erred in its determination Linhart's due process rights were violated, and in reviewing the administrative record de novo. Although the trial court was required in any event to exercise its independent judgment on the evidence,[8] we nonetheless find the error was prejudicial. Even under independent judgment review, the court was required to grant a "strong presumption of correctness" to the administrative findings, and to proceed on the basis that Linhart had the burden "of convincing the court that the administrative findings are contrary to the weight of the evidence." (*Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 817 [85 Cal.Rptr.2d 696, 977 P.2d 693].) We see no indication the court reviewed the administrative record in that light.

---

[8] "In cases reviewing decisions which affect a vested, fundamental right, the trial court exercises independent judgment on the evidence. [Citation.] Retirement benefits . . . have long been held to be a vested and fundamental right. .(*Strumsky v. San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 44–45 [112 Cal.Rptr. 805, 520 P.2d 29].) . . . Under applicable law, the trial court was required to exercise its independent judgment in reviewing the evidence admitted at the administrative hearing to determine whether such evidence supported [PERS's] findings concerning the amount of [the petitioner's] pension benefits." (*Molina v. Board of Administration, etc.* (2011) 200 Cal.App.4th 53, 60–61 [132 Cal.Rptr.3d 435], fn. omitted (*Molina*).)

In our view, this is a case predominantly involving questions of law, and in which "the probative facts are not in dispute and clearly require a conclusion that differs from that of the trial court." (*Robles v. Employment Development Dept.* (2012) 207 Cal.App.4th 1029, 1034 [144 Cal.Rptr.3d 36].) Accordingly, we conduct our review of the administrative record without deference to the trial court's findings and conclusions. (*Ibid.*)

## B. *Statutory Issues*

■ Section 20636, subdivision (a) provides a PERS member's pensionable compensation consists of the member's "payrate and special compensation." The term "payrate" is defined in relevant part as "the normal monthly rate of pay or base pay of the member paid . . . to similarly situated members of the same group or class of employment for services rendered on a full-time basis during normal working hours, pursuant to publicly available pay schedules." (§ 20636, subd. (b)(1).) However, as discussed below, Linhart waived any claim the payments in question were part of his payrate because the only issue he pursued in the administrative proceeding was whether his standby pay qualified as special compensation for purposes of the statute.

■ As discussed earlier, section 20636 and Regulation 571 contain two pertinent limitations on what may be considered pensionable special compensation. First, special compensation must be "for services rendered during normal working hours." (§ 20636, subd. (c)(3).) Second, to be classified as special compensation, the payment must be of a type that has been specifically delineated as special compensation by the board in Regulation 571. (§ 20636, subd. (c)(6); Reg. 571, subds. (c), (d).) In our view, the payments in issue fail on both counts.

### 1. *Normal Working Hours*

The board decision found as a fact "standby pay was compensation for services that Linhart rendered outside of his normal 40-hour workweek." From this, the board drew the legal conclusion the pay "was not special compensation, because it was paid for services rendered outside [Linhart's] normal working hours." Linhart maintains these determinations are against the weight of the evidence.

At the administrative hearing, the retired chief of Pleasanton's fire department, Stewart Gary, testified the 7.5 percent pay increment was to compensate fire division chiefs "for assigned duties in excess of the normal 40-hour workweek daytime office schedule." He stated "that was the prime intent, that the normal salary did not take into account the assigned after-hours duties." Later in the hearing, Linhart's counsel asked: "And was that for services that

were normally for work that was performed during the fire division chief's normal working hours?" Gary responded: "No. If the definition of normal working hours is a Monday through Friday, traditional 8:00 to 5:00 schedule, no. The additional compensation was for duties outside of the assigned office hours."

Linhart testified to the same effect. He stated he understood the 7.5 percent pay "represented work that I did outside of the 40-hour work week on evenings, weekends and holidays, and that work primarily was emergency response work." Later, he testified, "I believe it was due to additional emergency response requirements or as [the compensation agreement] states 'standby,' because I was assigned to a regular schedule of backup duty, which is what we call backup duty." He stated he made "a distinction between the backup and the ordinary schedule that the other division chiefs had." He further explained: "We would call it the backup duty, where . . . I had an emergency response vehicle with radios, pagers. And the fire chief would designate how quickly we needed to be able to respond and be in district. So I was pretty much on call . . . . And there was no overtime received for that."[9] Under questioning by PERS's attorney, Linhart affirmed paragraph 14.1 of the fire department's Interim Compensation Plan, titled "40 Hour Per Week Personnel," accurately defined what his work schedule was. That paragraph stated in pertinent part that the training division chief, the position Linhart held, "shall work a standard Monday through Friday 40 hour week."

Linhart maintains that since he was required to be available as a backup division chief on a regular schedule (three 24-hour shifts in each nine days), these backup duty periods were part of his "normal working hours" for purposes of section 20636. However, there was no dispute that, unless called in to relieve the division chief who had primary responsibility in an emergency, he could be at home after 5:00 p.m. every day during the week and all day on weekends and holidays, while on backup duty. There was no evidence in the record as to the circumstances in which he would be called upon to relieve the division chief or how frequently or infrequently those circumstances arose.[10]

---

[9] Linhart explained that as backup chief, "if there was ever a need for the primary [operations division] chief to be relieved for whatever reason, we would be there, ready to relieve that person."

[10] In his brief on appeal, Linhart asserts he "was required to respond to all significant fire and medical emergencies, either in a command position or as backup." The portions of the record he cites do not use those words and do not support the implication that he was frequently called in to work while on his backup schedule.

Linhart cites *City of Oakland v. Public Employees' Retirement System* (2002) 95 Cal.App.4th 29 [115 Cal.Rptr.2d 151] (*City of Oakland*) for the proposition that the "time fire personnel spend being ready to respond is considered part of the duties performed during their normal working hours." We do not find the case persuasive on that issue. *City of Oakland* did not involve an interpretation of the term "normal working hours." It simply held firefighters assigned to the Oakland Airport should be classified as public safety personnel for purposes of PERL because, among several other reasons, it was part of their job *while on duty at the airport* to respond in the unlikely event of a serious fire emergency there. (*City of Oakland*, at p. 59.) *City of Oakland* sheds no light on the issue of whether the normal working hours of a 40-hour-per-week fire department manager for purposes of section 20636 includes time spent at home on standby in the event a division chief needs relief in an emergency.

In our view, Linhart's position that his "normal working hours" included his standby schedule does not reflect a reasonable interpretation of the statute or of the standby pay provision of his labor agreement. It would mean Linhart's "normal" workweek was not 40 hours, but over 60 hours—a difference of more than 50 percent. Yet for the additional 20-plus hours added to his normal workweek he was only being compensated at a small fraction of his base salary. Consistent with the testimony of the witnesses, and the unambiguous language of Linhart's compensation plan, we think it is more reasonable to view the 7.5 percent pay increment as compensation to Linhart for being *available* to work on a standby basis *outside* of his normal working hours. Moreover, " 'where our review requires that we interpret the PERL or a PERS regulation, the court accords great weight to PERS interpretation.' " (*Molina, supra,* 200 Cal.App.4th at p. 61 [construing § 20636]; see *Prentice v. Board of Administration* (2007) 157 Cal.App.4th 983, 989 [69 Cal.Rptr.3d 167] [construing § 20636]; *City of Sacramento v. Public Employees Retirement System* (1991) 229 Cal.App.3d 1470, 1478 [280 Cal.Rptr. 847].) This is in recognition of the fact that as the agency charged with administering PERL, PERS has expertise and technical knowledge as well as " ' "an intimate knowledge of the problems dealt with in the statute and the various administrative consequences arising from particular interpretations." ' " (*Yamaha Corp. of America v. State Bd. of Equalization* (1999) 73 Cal.App.4th 338, 353 [86 Cal.Rptr.2d 362], quoting Asimow, *The Scope of Judicial Review of Decisions of California Administrative Agencies* (1995) 42 UCLA L.Rev. 1157, 1196.)

The board's decision in this case is presumptively correct with respect to the issue of whether the pay in question was for services rendered during

normal working hours, and Linhart fails to meet his burden of showing the evidence does not support the board findings, or that the statute or labor agreement are so ambiguous that the doubt should be resolved in his favor. Even assuming for the sake of analysis there was doubt on that score, Linhart would still not be entitled to prevail because the compensation in question did not meet the further requirement that it be of a kind affirmatively determined to be special compensation in Regulation 571.

### 2. Regulation 571

Linhart conceded in the course of the administrative proceedings, "under the CalPERS regulations standby pay is not included as one of the 'extra pays' on which final compensation is to be based for retirement benefit purposes." He maintains on appeal, however, that the 7.5 percent compensation he received was not in substance standby pay even though it was labeled that way in his compensation plan. He argues the compensation fell under five distinct "extra pay" categories authorized in Regulation 571—holiday pay, shift differential pay, training premium pay, management incentive pay, and off salary schedule pay. We do not believe the regulation is that elastic.

Holiday pay is described in Regulation 571 as "Additional compensation for employees who are normally required to work on an approved holiday because they work in positions that require scheduled staffing without regard to holidays." (Reg. 571, subd. (a)(5).) Linhart's pay did not meet this definition. His compensation plan provided in paragraph 7.1 that managers on a 40-hour, Monday through Friday schedule—which under paragraph 14.1 included Linhart's schedule as training division chief—got 12 approved holidays per year. Although Linhart might occasionally have to work on a holiday if he was on backup and was called in to relieve the shift commander, he was not "normally required to work" on holidays. In fact, he was normally *not* required to work on approved holidays. While it is true battalion or division chiefs in Livermore and Pleasanton had received holiday in lieu pay in the 1990's when their regular 56-hour-per-week shift pattern regularly required them to work on holidays, and there is some evidence the 7.5 percent pay increment paid to Linhart was intended in part to avoid financially penalizing managerial employees who did not work the standard 56-hour-per-week shift pattern, that does not mean Linhart's standby pay was actually paid for working on holidays. If anything, these historical factors show the compensation had to be paid for standby duties (or by raising the base salary) because Linhart could *not* be paid for regular holiday work he was no longer required to perform.

Regulation 571 defines "Shift Differential" pay as "Compensation to employees who are routinely and consistently scheduled to work other than a

standard 'daytime' shift, e.g., graveyard shift, swing shift, shift change, rotating shift, split shift or weekends." (Reg. 571, subd. (a)(4).) The evidence established Linhart was routinely and consistently scheduled to work a standard daytime shift of 8:00 a.m. to 5:00 p.m., Monday through Friday. There was no evidence he was routinely and consistently scheduled to work any other shift although "from time to time" he would have to substitute for one of the other division chiefs, and would work their modified 56-hour-per-week schedule when that happened. We find no evidence in the record the 7.5 percent reflected compensation for routinely working other than a standard daytime shift.

"Training Premium" pay is defined in the regulation as "Compensation to employees who are routinely and consistently assigned to train employees." (Reg. 571, subd. (a)(4).) Although as training division chief, it was certainly one of Linhart's central assigned duties to train employees, we find no evidence in the record the 7.5 percent pay increment he received was *because* he performed one of the central duties of his position. Absent some evidence, we will not lightly infer Pleasanton found it necessary or desirable to pay the fire department's training division chief separate "special compensation" for performing the core duty named by his job title. The mere fact one of the work assignments mentioned in Regulation 571 happens to overlap with Linhart's job description is not evidence any item of extra pay he received is attributable to that assignment.

## C. *Waived Issues*

Linhart did not propose his "management incentive pay" and "off salary schedule pay" theories at any time in the administrative proceedings or even in the trial court. These theories were first injected sua sponte by the trial court, as was the theory the 7.5 percent was part of Linhart's base payrate. In our view, Linhart waived all of these theories by failing to raise them in the administrative proceeding.

The courts have consistently held parties may not advance new theories in the courts that were not presented to the administrative agency. The court in *NBS Imaging Systems, Inc. v. State Bd. of Control* (1997) 60 Cal.App.4th 328 [70 Cal.Rptr.2d 237] held the trial court erred in granting a petition for writ of mandate based on a theory not raised in the administrative proceeding because "the hearing officer and the board had no opportunity to evaluate the application or import of these tardy assertions and the superior court had no authority to consider them." (*Id.* at p. 337.) Numerous cases are in accord that a party must present its factual and legal claims to the administrative agency

before it can obtain review of them in the courts. (See, e.g., *Coalition for Student Action v. City of Fullerton* (1984) 153 Cal.App.3d 1194, 1198 [200 Cal.Rptr. 855]; *City of Walnut Creek v. County of Contra Costa* (1980) 101 Cal.App.3d 1012, 1019–1020 [162 Cal.Rptr. 224]; *Weinberg v. Cedars-Sinai Medical Center* (2004) 119 Cal.App.4th 1098, 1115 [15 Cal.Rptr.3d 6]; *Southern Cal. Underground Contractors, Inc. v. City of San Diego* (2003) 108 Cal.App.4th 533, 549 [133 Cal.Rptr.2d 527].)

Linhart fails to demonstrate the board did not proceed according to law or that its findings and determinations under section 20636 were against the weight of the evidence or contrary to law. And he has waived judicial review of those issues he failed to raise in the administrative proceeding, including his claim the pay in issue was part of his base pay.

## D.  *Estoppel/Breach of Fiduciary Duty*

Linhart contends even if this court determines his standby pay is not pensionable under section 20636, PERS is nonetheless estopped by its own conduct from denying him higher pension benefits. He maintains all four elements of estoppel are satisfied here: (1) PERS knew or should have known there was a discrepancy between the member earnings reported for Linhart and the amount of earnings that would be calculated based on his reported hourly base payrate; (2) PERS either intended its failure to identify this discrepancy (and its receipt and retention of excess pension contributions from Linhart's employer) be relied upon, or Linhart had the right to believe it was so intended; (3) Linhart was ignorant of the discrepancy; and (4) Linhart in making his retirement plans and Pleasanton in not revising its fire department compensation plan relied on the conduct of PERS to Linhart's injury. (See *Driscoll v. City of Los Angeles* (1967) 67 Cal.2d 297, 305 [61 Cal.Rptr. 661, 431 P.2d 245].)

As a threshold matter, the parties differ over whether the estoppel remedy is available to Linhart as a matter of law. PERS asserts estoppel is not available "where the government agency to be estopped does not possess the authority to do what it appeared to be doing." (*Medina v. Board of Retirement* (2003) 112 Cal.App.4th 864, 870 [5 Cal.Rptr.3d 634] (*Medina*); see *Fleice v. Chualar Union Elementary School Dist.* (1988) 206 Cal.App.3d 886, 893 [254 Cal.Rptr. 54] ["principles of estoppel are not invoked to contravene statutes and constitutional provisions that define an agency's powers"].) In *Medina*, the Court of Appeal found estoppel was not available because the retirement board lacked authority to classify as safety members employees whose duties did not encompass being a police officer and did not otherwise meet the statutory definition of safety members. (*Medina*, at p. 869.)

Linhart principally relies on *Crumpler v. Board of Administration* (1973) 32 Cal.App.3d 567 [108 Cal.Rptr. 293] (*Crumpler*). In *Crumpler*, the city had misclassified animal control officers as police officers. When the misclassification came to PERS's attention, it reclassified the officers retroactively as miscellaneous members, and the employees sued. (*Id.* at pp. 570–571.) The trial court set aside the PERS decision in part on grounds of estoppel, and the Court of Appeal affirmed this determination. (*Id.* at pp. 583–584.) *Crumpler* recognized the rule that estoppel cannot enlarge a public agency's statutory or constitutional authority but found the rule was inapplicable because of a PERS provision, former section 20124 (now § 20125), stating PERS was the " 'sole judge of the conditions under which persons may be admitted to and continue to receive benefits under this system' ": "In view of the statutory powers conferred upon the board by section 20124, this is not a case where the governmental agency 'utterly lacks the power to effect that which an estoppel against it would accomplish.' " (*Crumpler*, at pp. 574–575, 584.)

We do not find *Crumpler* persuasive here. Linhart makes no claim section 20125 or any other provision of PERL authorized the board to make his standby pay pensionable even though it did not qualify as such under section 20636. Linhart argues instead that because the trial court found nothing in PERL precluded PERS from determining his extra pay was pensionable, PERS could have made that determination itself and estoppel is therefore available to him as a remedy if its conditions are satisfied. Because we disagree with the trial court's conclusion, and find section 20636 *did* at all times preclude PERS from treating Linhart's standby pay as pensionable compensation, we hold any award of benefits to Linhart based on estoppel is barred as a matter of law.

██ We find in any event Linhart has not proven all essential elements of estoppel are present. Pleasanton did not separately report the amounts at issue as special compensation as it was required to do. There is no evidence PERS knew about the existence of or nature and purpose of the extra pay Linhart was receiving, or knew Pleasanton and Linhart erroneously believed the payments were pensionable, until this dispute brought the facts to light. The first element of estoppel, that PERS knew the true facts, requires proof of either actual knowledge or of "careless and culpable conduct resulting in the deception of the party entitled to claim the estoppel." (*Banco Mercantil v. Sauls Inc.* (1956) 140 Cal.App.2d 316, 323 [295 P.2d 55].) In light of Pleasanton's failure to report the extra payments as special compensation as required by the PERS operations manual, we cannot deem PERS's failure to recognize the reporting discrepancy sooner "careless and culpable."[11] Further,

---

[11] We reject Linhart's claim that Pleasanton and PERS are in privity for estoppel purposes such that the city's knowledge and negligence can estop PERS from determining pensionable compensation according to law. (See *Hudson v. Board of Administration* (1997) 59 Cal.App.4th

the party claiming an estoppel must also prove it "did not have actual knowledge of the true facts [and] did not have notice of facts sufficient to put a reasonably prudent man upon inquiry, the pursuit of which would have led to actual knowledge." (*Banco Mercantil*, at p. 323.) Here, section 20636 and Regulation 571, and the terms of Linhart's compensation plan, should have put the city on notice the extra pay might not be pensionable. The rules regarding special compensation are explained in the operations manual PERS provides to contracting agencies. Considering all of the circumstances, we do not find PERS's failure to detect the city's misapprehension about standby pay would support an estoppel remedy.

■ Finally, Linhart maintains PERS is obligated to pay him higher retirement benefits because it breached its fiduciary responsibility by failing to provide timely notice Pleasanton was making excess contributions on his behalf. Linhart relies on a constitutional provision enacted by the voters in 1992 stating public pension board members must discharge their duties solely in the interest of and for the exclusive purpose of providing benefits to members and beneficiaries, minimizing employer contributions, and defraying administrative expenses, and that the duty of the board to its participants takes precedence over any other duty. (Cal. Const., art. 16, § 17, subd. (b).) He cites *City of Oakland, supra*, 95 Cal.App.4th at page 40 for the proposition PERS has a fiduciary duty to inform and deal fairly with its members and to provide timely and accurate information to its members.

In our view, Linhart's breach of fiduciary duty theory is simply a way of restating his equitable estoppel claim, which we have already found is barred as a matter of law. PERS's fiduciary duty to its members does not make it an insurer of every retirement promise contracting agencies make to their employees. PERS has a duty to follow the law. As stated in *City of Oakland*, the policy reflected in the constitutional provision is to "ensure the rights of members and retirees to their full, earned benefits." (*City of Oakland, supra*, 95 Cal.App.4th at p. 46.) It does not authorize an order compelling PERS to pay greater benefits than section 20636 allows, either by estoppel or as tort damages for an inadvertent failure to timely correct a contracting agency's error. (Cf. § 20160, subd. (a)(3) [authorizing PERS to correct errors or omissions of members, contracting agencies, or itself, but not to provide the party seeking correction with a "status, right, or obligation not otherwise available" under the PERL].)

For all of these reasons, we reverse the judgment.

1310, 1331–1332 [69 Cal.Rptr.2d 737] [allowing conduct of contracting agency to estop PERS would usurp PERS's statutory authority to determine compensation for retirement purposes and permit such agencies to disregard the applicable law].) To the extent that *Crumpler, supra*, 32 Cal.App.3d at pages 582–584 suggests otherwise, we do not find it persuasive.

## III. DISPOSITION

The judgment is reversed and the matter is remanded to the trial court with directions to enter a new judgment denying the petition for writ of mandate. Costs are awarded to appellant.

Marchiano, P. J., and Dondero, J., concurred.