Filed 6/26/19

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| CLARE BYRD,<br><br>      Plaintiff and Appellant,<br><br>      v.<br><br>STATE PERSONNEL BOARD et al.,<br><br>      Defendants and Respondents. | D073879<br><br><br>(San Diego County Super. Ct.<br>  No. 37-2017-00007971-CU-WM-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County,

Kenneth J. Medel, Judge.  Affirmed.

Walker Law and Justin O. Walker for Plaintiff and Appellant.

Alvin Gittisriboongul and Dorothy Irene Egel for Defendant and Respondent,

State Personnel Board.

Matthew G. Jacobs and Kevin Matthew Kreutz for Defendant and Respondent,

California Public Employees' Retirement System.

Brian Patrick Villarreal for Defendant and Respondent, Board of Trustees of the

California State University.

Clare Byrd appeals from the trial court's judgment denying her petition for writ of mandate and declaratory judgment. Byrd asked the court to intervene following the breakdown of a settlement agreement between her and the California State University system (CSU), which the State Personnel Board (SPB) initially approved. But following a refusal to comply with material terms of the settlement by the California Public Employees' Retirement System (CalPERS), SPB changed its position and rejected the settlement in a decision vacating its prior approval.

Among other provisions, the settlement agreement directed that Byrd would be reinstated to a classification with a significantly higher salary, which she had never held, and that she would receive compensation at the higher salary during the period that CSU, with her assistance, would apply for medical retirement benefits. Byrd requested that the trial court compel CalPERS to process her reinstatement at the higher salary level. CalPERS maintained it was unable to do so because Government Code section 21198— part of the statutory framework governing CalPERS's oversight of state pension funds— only authorized Byrd's reinstatement to a job classification she previously held before her termination.[1] The trial court agreed with CalPERS and denied Byrd's petition.

On appeal, Byrd argues that section 21198 allows CalPERS to reinstate Byrd to employment as a straightforward matter and does not require reinstatement to the same specific classification or pay rate. She emphasizes that the bargained-for terms of the settlement agreement contemplated a scenario in which Byrd would return to work, at

---

[1] All statutory references are to the Government Code unless otherwise indicated.

least for a short period, while her application for medical retirement benefits was processed.

In the typical case, section 21198 directs CalPERS to reinstate an employee who was involuntarily terminated but then returned to that same classification as a result of an administrative or judicial proceeding. The reinstatement thus allows CalPERS to effectuate the purpose of this specific provision and recreate the status quo ante. There may be atypical circumstances in which an individual can be properly reinstated (following involuntary termination and pursuant to an administrative or judicial proceeding) to a different classification. But if there are those instances, the statute requires a nexus between the new classification and the underlying dispute. In the absence of any such connection here, we find that section 21198 prevents CalPERS's compliance with the settlement agreement. Accordingly, we affirm.

FACTUAL AND PROCEDURAL BACKROUND

A.  *Byrd's Dismissal From San Diego State University*

In September 2014, after 14 years of employment, Byrd received a Notice of Pending Dismissal from her position as Administrative Analyst/Specialist at San Diego State University (SDSU), part of the CSU system. On December 9, 2014, SDSU provided Byrd with a Notice of Decision Regarding Disciplinary Action, which stated that she was dismissed from her employment effective December 15, 2014. Byrd then filed a Service Retirement Election Application with CalPERS, with a retirement date of December 31, 2014. CALPERS accepted her application and proposed effective retirement date.

3

B.      *Byrd's Appeal of Her Dismissal and Settlement with CSU*

On December 16, 2014, Byrd filed an appeal with the State Personnel Board (SPB) challenging her dismissal.  An Administrative Law Judge for the SPB later conducted a Prehearing Settlement Conference with the parties, which was successful.  Byrd and CSU entered into a stipulation for settlement conditioned on (1) Byrd's not revoking the agreement within seven days and (2) the SPB's approval.  Byrd declined to revoke the agreement, and the SPB approved the settlement.  The SPB found that the settlement was "consistent with the interests protected by the State's merit civil service system" but noted that, "in approving the settlement, the [SPB] expresses no opinion as to whether the terms of the settlement are otherwise reasonable under all the circumstances of the case."

1.      *Byrd's Obligations Under the Settlement Agreement*

Byrd agreed to withdraw all complaints and grievances then-pending and to waive and fully release CSU and related parties from any claims related to her employment.  She promised to cooperate with CalPERS regarding the application for medical retirement that CSU was to file on her behalf, and agreed to bear sole responsibility for any determination made by CalPERS with respect to any retirement application.  If she failed to fully cooperate, the settlement would be void and she would be deemed to have resigned from her position effective July 1, 2015.  If CalPERS denied the application, she would be deemed to have resigned from her position with CSU, effective the date of CalPERS's determination of the medical retirement application.  In either case, the settlement agreement would serve as her resignation and she would waive any and all

4

reinstatement rights. She further agreed to not apply for or accept other employment with CSU.[2]

2. *CSU's Obligations Under the Settlement Agreement*

CSU agreed to withdraw its Notice of Dismissal and remove it and all supporting documentation from Byrd's official personnel files. It also agreed to make several changes related to her employment. It would "reinstate" Byrd to the classification of Administrative Analyst/Specialist Exempt II, a classification she had not previously held, effective July 1, 2014. It would pay all back pay and benefits at the maximum salary for this new classification, $7,250 per month, with a deduction for salary already paid between July 1 and December 15 of 2014. It would also place Byrd on paid administrative leave from December 15, 2014, through June 30, 2015. It further agreed to apply to CalPERS for medical retirement benefits on Byrd's behalf and ensure that Byrd would be paid the maximum salary for her new classification during the entire period that Byrd's medical retirement application was pending.[3]

C. *CSU and Byrd's 2015 Efforts to Comply With the Settlement*

In May 2015, CSU personnel met to determine the steps necessary to comply with the settlement. Later that month, CSU raised Byrd's salary to $7,250 per month effective

---

[2] Byrd also waived any rights she had under Civil Code section 1524, which allows for the satisfaction of an obligation following partial performance under certain circumstances.

[3] CSU also agreed to provide her with four semesters of academic instruction at CSU pursuant to its fee waiver process (for eight years from the date of the settlement) and to forward all inquiries from prospective employers to its human resources office.

5

July 1, 2014, and placed her on administrative leave with pay effective from December 15, 2014 to June 30, 2015, at that same salary. In June 2015, CSU completed a CalPERS Reinstatement From Service Retirement Application to assist Byrd in requesting reinstatement from CalPERS, and it provided Byrd a check for about $18,000, the difference in pay between her old and new classifications, for the period between July 1 and December 1, 2014. CSU was able to pay Byrd the back pay for the July to December 2015 period because she was employed and had yet to be dismissed, but it was unable to do so for the December 2014 to June 2015 period because she was considered a retiree.

Byrd withdrew her grievance/unfair practice charge filed with the Public Employment Relations Board and her complaint before the Equal Employment Opportunity Commission. She also withdrew her appeal with the SPB.[4] In late July 2015, CSU offered to advance Byrd about $5,000, but Byrd did not accept it because she did not want to "operat[e] outside the terms of the SPB legally binding agreement and accepting a pay-advance deviates from our contract."

D.     *CALPERS's Letters to Byrd and SDSU*

In September 2015, CalPERS sent a letter to SDSU regarding its review of SPB's approval of the settlement. CalPERS found that the "award does not comply with the California Pubic Employees' Retirement Law" (PERL). To explain its rationale for the noncompliance finding, CalPERS pointed to an enclosed letter to Byrd also sent in

---

[4]     The SPB, however, retained jurisdiction over the enforcement of the settlement agreement pursuant to its own terms.

September 2015. The Byrd letter addressed three issues: (1) the "back pay" from July 1 to December 15, 2014, (2) the "paid Administrative Time Off" from December 15, 2014 to June 30, 2015, and (3) its inability to comply with SPB rulings that revoke or modify an adverse action in the absence of an employee returning to their position.

As to the back pay, CalPERS found that it met the definition of "Final Settlement Pay" pursuant to section 20636, subdivision (g)(4)(G), and was therefore "specifically excluded for the purposes of retirement." For the "paid Administrative Time Off," CalPERS found that it failed to meet the definition of "compensation earnable" pursuant to section 20636 "as it was not for services rendered on a full time basis." CalPERS further asserted that pursuant to section 19854, an SPB ruling "to revoke or modify an adverse action and allow compensation to be reported is only applicable when the employee returns to his or her position." On the basis of Byrd's employment history and sections (II)(2)–(4) of the stipulated agreement, CalPERS found she would "not return to the position [she was] requesting . . . Disability Retire[ment] from," and based on section (II)(3), that she had waived any right to return to her previous position.

E.      *Byrd's Motion to Compel Compliance with the SPB Decision*

In January 2016, Byrd filed a motion with the SPB to compel compliance with the terms of the settlement.  She described CSU's lack of compliance as well as CalPERS's resistance as outlined in its correspondence, and she noted that even without CalPERS's involvement, CSU was able to withdraw the Notice of Dismissal, reinstate her, and provide her the back pay.  CSU responded that "if it were to [withdraw the dismissal], Byrd was at risk that CalPERS would not then re-retire Byrd under the terms the parties agreed but that, under the terms of the Settlement, that is a risk Byrd would be responsible for bearing."  The next month, CSU rescinded Byrd's dismissal and processed a Staff Transaction Form, changing the characterization from dismissal to retirement.

F.      *SPB's Decision Voiding Its Prior Approval of the Settlement*

In December 2016, the SPB issued a decision voiding its prior approval of the settlement between Byrd and CSU.  The SPB deferred to CalPERS's legal conclusion— that Byrd's reinstatement would be unlawful under PERL.  It found the settlement agreement illegal on those grounds, and therefore held the agreement void and unenforceable.  Furthermore, the SPB found that CalPERS's refusal to effectuate Byrd's reinstatement "vitally affects" the settlement agreement, "reflects . . . the overall agreement," and "cannot be severed."  Under these circumstances, the SPB concluded that the "appropriate action" was to "void the entire Decision [approving the settlement] and put the parties in the position that they would have been had [SPB] not entered the Decision."

8

G.    *Byrd's Petition in the Superior Court*

In March 2016, Byrd filed a verified petition in the superior court seeking a writ of mandate and declaratory relief, naming the SPB and CalPERS as respondents. Following a meet and confer with SPB, she added CSU as a respondent in her First Amended Verified Petition (FAP). Byrd asked the court to compel CalPERS to reinstate Byrd and direct SPB and CSU to take all actions necessary to effectuate Byrd's reinstatement. She also sought a judicial declaration as to the legality and enforceability of the settlement agreement. Following the filing of respondents' answers, in which CSU admitted all material allegations, Byrd moved for judgment.

The trial court issued a tentative decision denying Byrd's motion. Following a hearing and additional briefing, the court issued its final Statement of Decision. It found that the settlement agreement "did not actually require [Byrd] to return to work," and therefore, that CalPERS rightly refused to reinstate her. According to the court's interpretation of the agreement, "no matter what CalPERS determined with respect to [Byrd's] anticipated Disability Retirement Application, [Byrd] was either to retire as disabled or resign, never to return to work." Thus, because Byrd "was not truly being reinstated pursuant to the [settlement agreement], CalPERS had no obligation to reinstate [Byrd]."

## DISCUSSION

A.    *Relevant Legal Standards*

We review questions of statutory interpretation de novo. (*Weatherford v. City of San Rafael* (2017) 2 Cal.5th 1241, 1247.) Where a question of law requires interpreting a

9

statute that governs CalPERS's responsibilities, " 'the court accords great weight to PERS interpretation.' " (*City of Pleasanton v. Board of Admin*. (2012) 211 Cal.App.4th 522, 539.) We do so because "as the agency charged with administering PERL, PERS has expertise and technical knowledge as well as ' " 'an intimate knowledge of the problems dealt with in the statute and the various administrative consequences arising from particular interpretations.' " ' " (*Ibid*., quoting *Yamaha Corp. of America v. State Bd. of Equalization* (1999) 73 Cal.App.4th 338, 353 (*Yamaha II*).)

We recognize that CalPERS's proffered statutory interpretation in this case did not arise from any quasi-legislative authority. As a result, the appropriate degree of judicial deference to the agency's interpretation is "fundamentally *situational*" (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 12 (*Yamaha I*)), lying " 'somewhere along a continuum with nonreviewability at one end and independent judgment at the other.' " (*Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 576, quoting *Shapell Industries, Inc. v. Governing Board* (1991) 1 Cal.App.4th 218, 232.) The parties understandably emphasize different factors in arguing for more or less deference. On one hand, the CalPERS interpretation in this case was not the product of a process that involved public notice and comment (*Yamaha I*, *supra*, 19 Cal.4th at p. 13), nor was it of longstanding duration such that it generated significant justifiable reliance by interested persons and entities (*id.* at p. 21 (conc. opn. of Mosk, J.)). At the same time, the interpretation was not merely an ad hoc position created by the agency to further its own interests in litigation. (*Yamaha II*, *supra*, 73 Cal.App.4th at p. 352.) CalPERS was not a party to the proceedings before the SPB at

10

the time it initially reviewed the parties' settlement agreement and opined that the settlement was inconsistent with PERL. Indeed, when it did so it was acting in its capacity as the administrator of CalPERS, with its attendant expertise, articulating what it believed was the scope of its statutory authority.

We thus take the CalPERS interpretation into account and endeavor to make a "commonsense assessment of [its] contextual merit." (*Yamaha I*, *supra*, 19 Cal.4th at p. 14.) The weight we accord it, if any, "will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." (*Skidmore v. Swift & Co.* (1944) 323 U.S. 134, 140.)

B.     *Section 21198 Prevents CalPERS From Reinstating Byrd to a Different Classification Without Any Connection to the Underlying Dispute.*

The parties agree that Byrd's appeal turns on the proper interpretation of section 21198, and their positions on that question stand in stark contrast. Byrd claims the statute's plain meaning does not require either the rendering of future services or reinstatement to the same job classification or pay rate. CalPERS does not focus on the rendering of future services, but it maintains the statute strictly requires that the involuntarily terminated employee be reinstated to the same classification.

In attempting to resolve this question we begin with the text of the statute. Section 21198 reads in relevant part:

> "A person who has been retired under this system for service
> following an involuntary termination of his or her employment, and
> who is subsequently *reinstated* to *that* employment pursuant to an

11

administrative or judicial proceeding, shall be *reinstated* from retirement."  (§ 21198, italics added.)

The plain meaning of the verb "to reinstate" is to place an individual in a former state or position.  In the context of this statute, which relates to the reinstatement of a particular employment, to reinstate means to place an individual in that former state or position of employment.  According to Black's Law Dictionary, to "reinstate" is defined "to place again in a former state, condition, or office"; according to the Oxford English Dictionary Online, "to reinstall or re-establish (a person or thing) in a former position, condition, etc."; and according to Merriam-Webster Online Dictionary, "to place again (as in possession or in a former position)."[5]  Because "reinstated" individuals are to be placed in their "former" state or position, reinstatement is not simply a matter of toggling a switch from not employed to employed, but instead necessarily implies they are returning to the specific position or classification they previously held.  A contrary interpretation ignores the legislative direction that the terminated employee be reinstated not merely to "employment" but rather to "*that* employment."  Typically, and perhaps with limited exceptions detailed below, a return to one's former state or position of employment would be to the same job, or at least the same job classification, including the same title and pay rate.

---

[5]    See Black's Law Dictionary (10th ed. 2014, p. 1477, col. 1); OED Online (3d ed. 2009) (<https://www.oed.com/view/Entry/161642?redirectedFrom=reinstate#eid [as of June 24, 2019], archived at <https://perma.cc/K7PC-GBVC>); Merriam-Webster Online Dictionary (2019) (<http://www.merriam-webster.com/dictionary/reinstate> [as of June 24, 2019], archived at <https://perma.cc/V9GF-KHEX>).

12

Interpreting the statute in this manner comports with the purpose for which it was designed.6 (See *Hassel v. Bird* (2018) 5 Cal.5th 522, 540–544 [" 'our fundamental task . . . is to determine the Legislature's intent so as to effectuate the law's purpose.' "], quoting *City of San Jose v. Superior Court* (2017) 2 Cal.5th 608, 616–617.) Where an employee has been involuntarily terminated and subsequently reinstated pursuant to an administrative or judicial proceeding, section 21198 allows CalPERS to return the parties to the status quo ante. It generally attempts to accomplish this purpose by reinstating affected employees to their prior job classifications and ensuring that the pension benefits are applied in the same manner as if the employees had not been involuntarily terminated.7

Both sides seek support for their arguments from a prior decision of the Court of Appeal involving CalPERS's compliance with settlement agreements containing specific directives regarding retirement benefits. (See *Molina v. Board of Administration* (2011) 200 Cal.App.4th 53 (*Molina*).) But *Molina* is of little relevance here. As Byrd has aptly noted, her appeal turns on the parameters of section 21198's reinstatement terms. *Molina*, however, involved an issue that is related but not directly relevant—whether certain

---

6    We grant CalPERS's request for judicial notice as to Exhibits A–D, the excerpts related to the legislative history of section 21198, and deny its request as to all other exhibits.

7    We recognize that Byrd disclaims any intent to increase her retirement benefits by reference to the new job classification agreed to as part of the settlement. But whether the retirements benefits would be affected in this particular case does not control what the Legislature intended when it limited reinstatement "to *that* employment" in section 21198.

13

settlement proceeds can be utilized to increase an employee's final compensation for the purposes of calculating pension benefits. (*Id.* at pp. 57–60.) The court briefly mentioned section 21198 in recounting the procedural history, noting the trial court's analysis that under the statute, "it is necessary that there be a reinstatement for a genuine period of service, not a one-day reinstatement." (*Id.* at p. 60.) Later, the court rejected the appellant's argument that section 21198 provided any support for his argument on appeal, stating in a footnote that the statute "merely recognizes that pursuant to judicial proceedings, an employee who is involuntarily terminated from his or her employment may be reinstated and, as a result, CalPERS may be required to provide service credit for the period of reinstatement." (*Id.* at p. 67, fn. 16.) The *Molina* court, however, had no need to further address section 21198 in holding that statutory provisions in PERL prevented the settlement agreement from dictating that certain proceeds be utilized to increase final compensation for the purpose of calculating pension benefits. (*Id*. at 67.)

We do not mean to hold, as CalPERS appears to suggest, that there could *never* be a circumstance in which reinstatement to a different classification at a higher salary would nonetheless effectuate a return to an employee's former state consistent with section 21198. It is unnecessary to precisely define those circumstances for purposes of this case. To the extent they exist, the statute's plain meaning and purpose would require that the different classification and higher salary have some connection to the underlying dispute, such as in the case of an individual reinstated to a higher classification following a proceeding regarding an alleged failure to promote. Here, however, Byrd has alleged no such connection. The record instead suggests that Byrd's reinstatement to the different

14

classification was merely part of a package of benefits that CSU sought to exchange for the promises it received from Byrd in the settlement agreement. Under these circumstances, section 21198 prevents CalPERS from complying with the settlement agreement's directive that Byrd be reinstated to a different job classification at a higher salary that has no connection to the underlying dispute, and the SPB properly refused to approve the settlement.[8]

We appreciate that the settlement was conditioned on the SPB's approval, and that the SPB's decision to void its prior approval (which we effectively validate) leaves the parties without an enforceable agreement. As the SPB noted in its decision withdrawing approval of the settlement, the immediate effect of that ruling was to reinstate Byrd's appeal challenging her termination. In light of intervening events, however, the parties apparently dispute what recourse, if any, remains. It will ultimately be for the SPB to determine whether and to what extent Byrd's termination claim survives and, if so, for the parties to decide whether they can negotiate a new agreement that could be approved by the SPB and implemented by CalPERS.

---

[8] Because CalPERS properly refused to comply with the settlement agreement, we need not address the parties' additional arguments.

15

DISPOSITION

The judgment is affirmed. In the interests of justice, all parties shall bear their own costs on this appeal.

DATO, J.

WE CONCUR:

AARON, Acting P. J.

GUERRERO, J.

16