Filed 10/28/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| JASON MASS et al.,<br><br>      Plaintiffs and Appellants,<br><br>v.<br><br>THE REGENTS OF THE UNIVERSITY OF CALIFORNIA et al.,<br><br>      Defendants and Respondents. | A170424<br><br>(Alameda County Super. Ct. No. RG17879223) |

Jason Mass and Karen Graf appeal from the trial court's judgment in favor of the Board of Regents of the University of California (The Regents) and two individual defendants on plaintiffs' claims for breach of contract and breach of fiduciary duty. Plaintiffs' claims are based on the theories that either the University of California Retirement Plan (Plan) entitled members to benefits retroactive to their date of eligibility when members requested benefits after age 60 or, alternatively, that The Regents should have told them that the Plan did not allow retroactive benefits.[1] The trial court granted The Regents summary adjudication on the issue of whether the Plan

---

[1] "We refer to 'the Regents' in the singular because the California Constitution created a 'corporation known as "The Regents of the University of California," ' a singular noun." (*De Vries v. Regents of University of California* (2016) 6 Cal.App.5th 574, 580, fn. 2.) References to The Regents also include the individual defendants.

entitled former employees to such retroactive benefits; the court later ruled after a bench trial that The Regents did not breach its fiduciary duty by failing to dispel a few members' unfounded assumptions to the contrary. Plaintiffs now contend that the trial court's summary adjudication ruling misconstrued the Plan and that the court applied the wrong legal standard in its ruling on their breach of fiduciary duty claim. We find no error and will affirm.

## BACKGROUND

### I. General terms of the Plan

The Regents adopted the Plan in 1971, and the Plan's terms were first contained in a document called the "Retirement Manual." In 1989, The Regents reorganized the Plan and restated its terms in the Plan document that remains in effect today. The Regents is the Plan's trustee, responsible for the Plan's administrative and investment functions. The president of the University of California is the Plan administrator.

### A. Membership and Retirement

The Plan is lengthy, so we focus only on those aspects that are relevant to plaintiffs' arguments in this case and ignore other provisions, such as those relevant to disability benefits. Eligible employees, meaning certain categories of employees of the University of California or an affiliate (together, University) who meet certain minimum work hours requirements, are automatically members of the Plan. Members are grouped into tiers based on when they began working for the university. Members can be members of more than one tier. Plaintiffs are members of the 1976 tier, which applies to employees hired or rehired before July 2013.

The Plan is funded by contributions from members from their wages, contributions from The Regents, and interest and income on Plan assets.

However, there was a window, from the early 1990s until 2010, when The Regents did not require employees to contribute to the Plan. The total amount of a member's contributions before any benefits are paid, together with interest thereon credited at rates set by The Regents, is defined in the Plan as accumulations. The Plan is a defined benefit plan, meaning it offers each member certain benefits regardless of the amount of money the member may have contributed. As of 2022, the Plan had over 247,000 current and former employee members, over 74,000 retired members, and over $81 billion in assets. The Plan had an unfunded actuarial liability of over $10 billion.

Members who are employed at the University are active members. As relevant here, inactive members are former employees who have not yet elected to retire and who have five years of service credit. Until 2010, members who left University employment without qualifying for inactive member status had to receive a refund of their accumulations. Inactive members can also choose to receive a refund of their accumulations.

## B. Retirement

The Plan defines the normal retirement age for the 1976 tier as age 60. Section 5.05 of the Plan, titled "Early Retirement," states that an active or inactive member who is at least 50 years old and has earned at least five years of service credit "may elect to retire at any time by complying with Plan requirements as stated in Section 12.03."

Section 12.03 of the Plan states that every election for a Plan benefit or benefit payment option must be in accordance with procedures the Plan administrator establishes. Such elections are effective only when filed with the Plan administrator, approved, and processed, and they cannot be changed after the Plan has made a payment to the member. The Plan also contains a

3

claims procedure, which states, "A Member must submit a request for benefits under the Plan."

A member who has retired and has received retirement benefits is subject to certain restrictions if the member wants to resume working for the University, in part to comply with Internal Revenue Service rules. Among other things, the hiring department must demonstrate a particular need for the rehired employee every 12 months, and the member must have a break in service of at least 30 calendar days. To continue receiving monthly retirement benefits, the member must work no more than 43 percent time during a 12-month period. If a member works more than 43 percent time, the member must suspend receipt of monthly retirement benefits. Such a member could then accrue additional service credit and salary for future monthly benefits.

## C. Retirement Benefits

Section 5.06 of the Plan (section 5.06) states, "The Basic Retirement Income for a Member's 1976 Tier Benefit that is payable under this Article 5 at the Member's Retirement Date is equal to the product of" the member's years of service credit, a factor corresponding to the member's age at the member's retirement date, and the member's highest average compensation.[2] The Plan defines a member's retirement date as the date when a member's retirement income begins or the member takes a lump sum cashout. But the Plan further specifies, "A "Member's Retirement Date may not be earlier than the day following separation from University service or the first day of the

---

[2] Separate articles of the Plan address benefits for different classes of employees. Although the parties do not address explicitly which class plaintiffs fall in, the parties both cite to article 5 of the Plan as governing in this case, so we do likewise.

4

month in which the Retirement Income or Lump Sum Cashout application is received by the Plan Administrator, whichever is later."

To determine the age factor used to calculate a member's benefits, the Plan includes a table of factors for each year and month of age at the member's retirement date, starting at age 50 and ending at age 60 and 11 months. The factors for older ages are higher. But all the factors for the ages in the table are intended to be actuarially equivalent, meaning that given mortality and inflation assumptions, lower monthly payments for a member who retires earlier and receives benefits for a longer period before death yield the same total benefit as higher monthly payments for a member who retires later and receives benefits for a shorter period of time before death.

Because the age factors do not increase after age 60 years and 11 months, setting a retirement date after that age will not increase the age factor any further. However, in some scenarios, a member's monthly retirement income can still increase if the member's retirement date is after age 60. This would occur, for example, if a member continued or returned to work after age 60, thereby earning additional years of service credit and potentially a higher salary.

The Plan provides for certain other types of payments to members instead of the basic retirement income. Members who have sufficient service credit to retire may choose to receive a refund of their accumulations, the same as when an active member leaves University employment without qualifying for inactive member status. A retiring member may choose, in lieu of monthly payments, to take instead a lump sum cashout, which is a single payment that is actuarially equivalent to the total amount the member would be expected to receive in basic retirement income during the member's life. A member may also choose to receive a reduced monthly payment but then

5

have a designated person called a contingent annuitant receive monthly benefits for the duration of the contingent annuitant's life. The Plan offers four different contingent annuitant options, with different tradeoffs between payments to the member and the contingent annuitant.

The Plan allows for preretirement survivor income in some situations when a member dies before retiring. When an active member dies with at least two years of service credit, a percentage of that member's final salary "shall be paid" to eligible survivors monthly. An eligible survivor is a child, dependent parent, spouse, or domestic partner of a deceased active or retired member, so long as such child, dependent parent, spouse, or domestic partner meets certain criteria. An active or inactive member who dies "[w]hile [e]ligible to [r]etire" (italics omitted), meaning after age 50 with more than five years of service credit, and who has a living spouse or domestic partner will be deemed to have retired on the date of death and benefits will be paid to the spouse or domestic partner according to one of the contingent annuitant options. The Plan also allows for a postretirement survivor continuance, which is a payment of a percentage of a retired member's monthly benefit paid to the member's eligible survivors.

Certain members employed between April 1992 and 2003 accrued capital accumulation credits, which were amounts calculated as a percentage of the members' compensation. A member with such credits automatically receives payment of them, called a capital accumulation payment, when the member elects monthly retirement payments, receives a refund of accumulations, or receives a lump sum cashout. A member who leaves University employment and becomes an inactive member can also choose to receive the capital accumulation payment.

6

As required by federal law, the Plan is subject to a minimum distribution requirement, meaning that all members must receive a minimum distribution after reaching age 70 and one half or, if the member is still employed as of that age, after leaving University employment.

The calculation of monthly benefits is more complicated for members in certain circumstances. For example, the Plan gives reciprocity to service credit and compensation a member earns under the Public Employees' Retirement System (PERS), so long as the member retires on the same date under both systems. Similarly, some members who are also members of the State Teachers Retirement System (STRS) can include STRS service credit or compensation in their retirement calculations under the Plan if they retire on the same date under both systems.

### D. Section 12.10 of the Plan

In 1972, the Legislature enacted former section 1521, subdivision (a) of the Code of Civil Procedure to specify that unclaimed employee benefit plan distributions would escheat to the state if the owner had not, "within seven years after it [became] payable or distributable, accepted such distribution, corresponded in writing concerning such distribution, or otherwise indicated an interest" in the distribution.[3] (Former § 1521, subd. (a), as added by Stats. 1972, ch. 856, § 4.) But an unclaimed distribution would not escheat to the state "if, at the time such distribution shall become payable to a participant in an employee benefit plan, such plan contains a provision for forfeiture or expressly authorizes the trustee to declare a forfeiture of a distribution to a beneficiary thereof who cannot be found after a period of time specified in such plan." (*Id.*, subd. (b).) The current version of the statute is similar but

---

[3] Subsequent undesignated statutory citations are to the Code of Civil Procedure.

7

now states that unclaimed employee benefit plan funds will escheat after three years and creates another exception not relevant here. (§ 1521.)

In 1977, the Plan was holding about $70,000 of unclaimed mandatory refunds in accounts payable status. The University's general counsel's office recommended taking advantage of the escheatment exception in section 1521, former subdivision (b) by adopting a forfeiture provision to cover all unclaimed Plan funds "payable to a Member, Retired Member, Beneficiary, Survivor, or Co-annuitant." The Regents adopted the forfeiture provision as an amendment to an existing provision in the Retirement Manual stating that an inactive member would be presumed dead if he or she could not be located by a reasonable search within five years from the member's compulsory retirement date.

As amended over the years, this forfeiture provision, titled "Unclaimed Benefits and Accumulations," is currently found in section 12.10 of the Plan (section 12.10). The section states in full:

"In any situation where monthly benefits are payable, a Refund of Accumulations, or a Capital Accumulation Payment is due but no claim for such benefits or refund has been received, or where a Refund of Accumulations is required but no request for refund has been received, a reasonable search, including mailing of a registered letter to the last known address, shall be made to ascertain the whereabouts of the eligible Member, Eligible Survivor, or Beneficiary.

"If, at the end of the Plan Year following the Plan Year in which any payment of monthly benefits, refund, or a Capital Accumulation Payment is due and payable from the Plan, such search remains unproductive and the payments due still cannot be made, such amounts shall revert to the Plan. If the person or persons entitled thereafter come forward and request payment

8

and establish such entitlement, the amounts then due, including retroactive payments from date of eligibility, shall be paid accordingly.

"If, within five years from age 70, no evidence has been obtained as to the whereabouts of an Inactive Member, it shall be presumed for all purposes of the Plan that such Member died on the day preceding the date such Member would have attained age 70, and benefits shall be paid accordingly."

At no time since The Regents adopted section 12.10 has it interpreted the provision to allow for the retroactive payment of monthly benefits before a member applies for retirement. The Regents receives roughly 5 to 10 requests for retroactive benefits each year and has always denied them based on its position that the Plan does not provide for retroactive benefits.

### E. Plan communications

The Regents informs Plan members about the terms of the Plan in various ways, including written summaries and communications regarding Plan benefits, as well as online, in-person, and telephone resources. The Plan has historically sent letters to inactive members who were approaching age 60 to tell them about retirement. These letters told employees that there was no discernable advantage for a separated employee to postpone retirement after age 60, since maximum benefits were generally payable at that age. These letters did not tell members that they would lose out on benefits by failing to elect them before age 60.

## II. Litigation

Graf was born in 1949. She was employed by The Regents for about 17 years, from 1978 until 1995, when she was almost 46 years old. Graf and her former spouse divided her service credits and rights to Plan benefits during a divorce. In 2009, a few months before she turned 60, Graf received a letter from the Plan telling her there was no discernable advantage to postponing

retirement after age 60. However, because Graf was still working at the time and the letter did not mention any adverse consequences from delaying retirement, she did not claim her benefits. In February 2015, she submitted a written application and began receiving benefits. She asked for payment of benefits retroactive to 2009, but The Regents refused. Graf calculated that as a result she lost 65 months of retirement income payments, which totaled approximately $154,000.

Mass was born in 1945 and worked for The Regents for nine years from 1993 to 2002, when he was 57 years old. To the best of his knowledge, he did not receive a letter from the Plan when he turned 60 in 2005. In January 2015, shortly before he turned 70 years old, the Plan notified him that he would soon be subject to mandatory minimum distribution. He contacted the Plan and asked for benefits retroactive to age 60, but The Regents refused. Mass then applied for and received a monthly retirement payment as of May 2015. Mass calculated that he lost 10 years of payments, which totaled about $172,000.

In 2017, Mass and Graf filed a class action complaint alleging claims for breach of contract, breach of fiduciary duty, and declaratory relief. Their breach of contract claim alleged that section 12.10 entitles members to retroactive benefits from the date of eligibility when they do not claim benefits at or before age 60. Their fiduciary breach cause of action alleged that The Regents breached its fiduciary duty by failing to inform members that it had a policy that postponing retirement past age 60 would result in a forfeiture of benefits.

By stipulation, The Regents moved for a summary adjudication that section 12.10 does not impose a legal duty on The Regents to pay retroactive monthly retirement income. The trial court granted the motion in August

10

2018 based on the text of section 12.10, its enactment history, and The Regents' consistent practice of denying retroactive benefits.

In 2020, for the purposes of plaintiffs' fiduciary breach claim, the trial court certified a class of inactive members who had separated from employment covered by the Plan, reached the age of 60, and had either requested a lump sum cashout or monthly retirement income after their 60th birthday or had not yet submitted a claim for a lump sum cashout or monthly retirement income. The trial court bifurcated trial on the fiduciary breach claim, with a first phase to decide whether The Regents owed the class members a fiduciary duty. The trial court concluded that The Regents owed the class a fiduciary duty to fully and fairly inform members of their retirement options. In the second phase of trial, the trial court considered whether The Regents had breached its fiduciary duty and concluded it had not. The trial court therefore entered judgment for The Regents.

## DISCUSSION

### I. Breach of Contract

#### A. Plain language and context of section 12.10

"The trial court disposed of [plaintiffs'] contract claim[] on [T]he Regents' motion for summary adjudication of issues. 'In reviewing an order granting summary adjudication of issues, we are governed by the rules generally applicable to review of summary judgments. [Citation.]' [Citation.] 'The standard of review in summary judgment cases is that of independent review.' " (*Creighton v. Regents of University of California* (1997) 58 Cal.App.4th 237, 242 (*Creighton*).) As the parties agree, independent review applies because the trial court's ruling depended on its interpretation of the Plan, either as a contract or a quasi-statute. (*Id.* at pp. 242–243 [pension benefits, even when created by statute, also create a contractual obligation];

11

*Miklosy v. Regents of University of California* (2008) 44 Cal.4th 876, 889 [" ' "policies established by the Regents as matters of internal regulation may enjoy a status equivalent to that of state statutes" ' "].)

" 'Whether interpreting a provision of a written instrument or statute, we seek the drafters' intent, and we start with the plain meaning of the provision's text and with its context within the statute or instrument.' " (*Lombardo v. Gramercy Court* (2024) 107 Cal.App.5th 1028, 1034.) "[A]mbiguous language in a retirement plan is subject to judicial construction [citation], and pension provisions should be liberally construed to favor the applicant [citation]. A provision is, however, ambiguous only when it is susceptible of two or more reasonable constructions. [Citation.] When, on the other hand, the language is clear and unambiguous, '. . . there is no need for construction and courts should not indulge in it.' " (*Creighton, supra*, 58 Cal.App.4th at p. 244.)

Plaintiffs' breach of contract claim rests on their view that The Regents violated section 12.10 of the Plan by not paying them retroactive monthly benefits. Section 12.10 consists of three paragraphs, the first two of which are at issue here. The first paragraph consists of one sentence, which states, "In any situation where monthly benefits are payable, a Refund of Accumulations, or a Capital Accumulation Payment is due but no claim for such benefits or refund has been received, or where a Refund of Accumulations is required but no request for refund has been received, a reasonable search, including mailing of a registered letter to the last known address, shall be made to ascertain the whereabouts of the eligible Member, Eligible Survivor, or Beneficiary." While the punctuation is imperfect, the operation of the provision is clear enough when it is read as a whole. When monthly benefits are payable, a refund of accumulations or a capital

12

accumulation payment is due, or a refund of accumulations is required, even though no claim or request for such benefits or refund has been received, the Plan administrator must search for the eligible member, eligible survivor, or beneficiary to whom the relevant payment should be made.  The key issue here is what it means for monthly benefits to be "payable."  Section 12.10 does not define "payable," nor is it a defined term in the Plan, so we must look to other Plan provisions to provide the necessary context.  (*Lombardo v. Gramercy Court*, *supra*, 107 Cal.App.5th at p. 1034 [interpret instrument or statute by language with its context].)

Section 5.06 addresses precisely what monthly benefits are payable, stating, "The Basic Retirement Income . . . that is payable under this Article 5 at the Member's Retirement Date is equal to the product of" the member's years of service, highest average compensation, and applicable age factor at the member's retirement date.  The Plan defines a member's "Retirement Date" as "the date as of which a Member's Retirement Income commences or the Member's cashout date if the Member is eligible to, and elects, a Lump Sum Cashout."  Plugging this definition into section 5.06 is not very helpful, since it simply means that basic retirement income is payable on the date that retirement income commences.

But the definition of "Retirement Date" is subject to the proviso, "A Member's Retirement Date may not be earlier than the day following separation from University service or the first day of the month in which the Retirement Income or Lump Sum Cashout application is received by the Plan Administrator, whichever is later."  When read with this proviso in mind, section 5.06 establishes that monthly benefits are "payable" no earlier than the first day of the month in which the Plan's administrator receives the member's application for retirement income.  This is consistent with section

13

12.03 of the Plan, which states that an election of Plan benefits must be made in accordance with procedures the Plan administrator establishes and becomes effective only when filed with the Plan administrator. Both of these provisions mean that an election of monthly retirement benefits cannot be effective retroactively.

The Plan's requirement of an application before monthly benefits can become payable to a member makes sense in light of the numerous choices a member must make regarding Plan benefits. At the outset, members can choose not to receive any benefits at all and instead to request a refund of accumulations, just as employees had to do before 2010 when they separated from University employment with fewer than five years of service credit. Next, a member opting for retirement income must choose whether to take monthly benefits or a lump sum cashout. A member who wants monthly benefits must then choose whether to split the benefits between the member and a contingent annuitant. Members must also choose the age at which to begin receiving monthly benefits. While the Plan defines a member's normal retirement age as age 60, members can receive benefits as early as age 50, and nothing requires members to begin receiving any benefits from the Plan until after age 70. Until a member reaches age 70 and a half, there are no automatically calculated payment amounts for members or default payees to receive payments. In short, because there are so many unknowns about when, to whom, and how much to pay, monthly benefits cannot be considered payable before a member submits an application.

Returning to section 12.10, this interpretation of section 5.06 means that section 12.10 does not apply until a member has submitted an application for benefits, because only then do monthly benefits become "payable." But this reading threatens to make one of the conditions in

section 12.10's first paragraph a nullity on its face.  As plaintiffs point out, if monthly benefits are not payable to a member until a member applies, how could there ever be a "situation where monthly benefits are payable . . . but no claim for such benefits . . . has been received"?

The answer is that even though monthly benefits may not be payable to a *member* without a claim, monthly benefits can be payable to one of the *other* categories of people mentioned at the end of the paragraph—an eligible survivor or beneficiary—even though such eligible survivor or beneficiary has not submitted a claim.  Eligible survivors are certain children, dependent parents, spouses, or domestic partners of deceased active or retired members.  When a member dies before retiring, the Plan states that survivor income "shall be paid" to eligible survivors monthly and specifies how to calculate the income that must be paid.  When a member dies after retirement, the Plan states that "a monthly benefit shall be paid" to an eligible survivor and specifies the method of calculation and order of priority of the categories of survivors.  None of these provisions requires an election, claim, or application before the recipient becomes entitled to the payment or before it can be calculated.  Thus, construing the Plan to make monthly benefits payable to a member only after an application does not make the first paragraph of section 12.10 nonsensical, as plaintiffs contend.

Nor is the reference to "eligible Member" at the end of the first paragraph surplusage, because a member could be due other types of payments without a claim.  A refund of accumulations or a capital accumulation payment can be owed automatically to a member in certain circumstances.  For example, until 2010 a member who left University employment without enough service credit to become an inactive member was required to take a refund of accumulations.  A member who receives a

refund of accumulations also automatically receives a capital accumulation payment. It is possible for section 12.10 to apply to a member even if monthly benefits are not payable to the member because of a lack of an application.

Section 12.10's second paragraph states, "If, at the end of the Plan Year following the Plan Year in which any payment of monthly benefits, refund, or a Capital Accumulation Payment is due and payable from the Plan, such search remains unproductive and the payments due still cannot be made, such amounts shall revert to the Plan." The use of "such search" connects this paragraph to the first. Because monthly benefits are not payable to a member until a member has applied for them, this reversion provision likewise does not apply until a member has applied for benefits.

The second sentence of the second paragraph continues, "If the person or persons entitled thereafter come forward and request payment and establish such entitlement, the amounts then due, including retroactive payments from date of eligibility, shall be paid accordingly." As plaintiffs point out, the Plan elsewhere refers to eligibility in other contexts, such as to employees eligible to join as members, an employee eligible to elect a lump sum cashout, survivors eligible for benefits after the death of a member, or members who die while eligible to retire. But the Plan does not specifically assign a blanket definition of "eligible" for the whole Plan, so the meaning depends on its context. In section 12.10 specifically, the phrase "date of eligibility" for retroactive payments, as well as "such entitlement," can only refer to the date that the monthly benefits, refund of accumulations, or capital accumulation payments mentioned in the first sentence of the second paragraph became due and payable. Retroactive payments are tied to "the amounts then due" that reverted to the Plan in the first sentence of the

16

second paragraph, which are those that are payable and due but cannot be made to the payee. Because monthly benefits for a member are not payable and do not revert to the Plan under section 12.10 until a member applies for them, such benefits likewise are not subject to the allowance for retroactive payments until after a member has submitted an application. By contrast, monthly benefits for an eligible survivor would be payable upon a member's death even though the survivor had not applied for them, so a survivor who later came forward and established his or her entitlement would be entitled to retroactive monthly benefits, using the date of the member's death as the date of eligibility.

## B. Plaintiffs' interpretation

Plaintiffs offer a different interpretation of the text of section 12.10.[4] In their view, a member is eligible to receive monthly benefits and the monthly

_____

[4] Amicus curiae Pension Rights Center directs us to *Canseco v. Construction Laborers Pension Trust* (9th Cir. 1996) 93 F.3d 600, 606–607, which, applying federal law, held that pension plan language defining eligibility for a pension required the pension administrator to make retroactive payments. Plaintiffs did not cite this case or others like it. (See, e.g., *Clarke ex rel. Estate of Pickard v. Ford Motor Co.* (E.D. Wis. 2004) 343 F.Supp.2d 714, 722 ["The cases uniformly hold that application requirements in plans are not conditions of eligibility"].) This is presumably because plaintiffs' argument turns on section 12.10's treatment of unclaimed benefits, not the Plan language defining eligibility for benefits or defining the start date for benefits. In any event, we find *Canseco* and similar cases to be distinguishable because the language of the Plan here is different and, as explained *ante*, does not permit the payment of monthly benefits to a member before a member applies for them. This case is therefore more similar to *Lagerman v. Arizona State Retirement System* (2020) 248 Ariz. 504, 507–510, which distinguished *Canseco* on the same grounds and held a retirement plan did not have to pay benefits until after a member submitted an application. *Lagerman* relied in part on the fact that a member needed to choose between various benefit options before the retirement plan could know what or whom to pay, just like the Plan here. (*Id.* at pp. 508–509.)

benefits are "payable" when the member has at least five years of service, is at least 50 years old, and has separated from University employment. Thus, according to plaintiffs, section 12.10 means that when a member requests monthly benefits after the date on which the member satisfied these minimum requirements, the member is entitled to receive retroactive benefits going back to that date, which section 12.10 refers to in its second paragraph as the "date of eligibility."

In support of their interpretation of "payable," plaintiffs cite Black's Law Dictionary's definition of "payable": "(Of a sum of money or a negotiable instrument) that is to be paid. An amount may be payable without being due. Debts are commonly payable long before they fall due."[5] (Black's Law Dict. (12th ed. 2024) p. 1360.) Plaintiffs contend that section 12.10 reflects this distinction between benefits being payable and due by stating in the second paragraph that benefits are payable from eligibility but are not due until a member comes forward and requests payment. Plaintiffs also cite the letter The Regents sent Graf in 2009, around the time of her 60th birthday, which stated, "There is no discernable advantage for a separated employee to postpone retirement income from UCRP after age 60, as maximum benefits

---

[5] Plaintiffs also cite the Supreme Court's interpretation of Government Code section 31461, subdivision (b)(2)'s exclusion of payments for unused leave beyond what is "earned and payable" in each 12-month period of the final average salary period under the County Employees Retirement Law of 1937 (Gov. Code, § 31450 et seq.). (*Alameda County Deputy Sheriff's Assn. v. Alameda County Employees' Retirement Assn.* (2020) 9 Cal.5th 1032, 1096, fn. 31 (*Alameda Sheriff's Assn.*).) This interpretation is not applicable or particularly helpful given the differences in language, retirement systems, and context between section 12.10 and Government Code section 31461. Additionally, the Supreme Court's interpretation of "earned and payable" there turned on the question of when unused leave was earned, rather than when it was payable. (*Alameda Sheriff's Assn.*, at p. 1096 & fn. 31.)

are generally *payable* at this age." (Some italics omitted.) The letter also asked Graf for certain information to provide her with a calculation of the benefits that she was due.

We have no quarrel with plaintiffs' definition of "payable," which accords with our interpretation of section 12.10. Monthly benefits are not "to be paid" and cannot be paid to members before they submit an application. (Black's Law Dict., *supra*, p. 1360.) But plaintiffs misapprehend the distinction the Plan draws between payments that are payable and those that are due. As The Regents cogently explains, the first paragraph of section 12.10 refers to a refund of accumulations or a capital accumulation payment as "due" because such payments must be paid all at once. By contrast, it describes monthly benefits as "payable" because, after a member has applied, the obligation to continue making monthly benefits payments extends indefinitely into the future. A given month's retirement payment is only due on the specific date when it must be made. Thus, it makes sense for the second paragraph of section 12.10 to provide for reversion to the Plan of any amounts that are "due and payable." Only those portions of the stream of payable monthly benefits whose deadlines have already passed and must be made immediately will revert to the Plan, not the entire lifetime's worth of retirement benefits. Payments that become due in succeeding Plan months will revert at the end of each successive Plan year, on a rolling basis. Nothing about this changes the fact that monthly benefits are not payable to a member until the member has applied for them.

Section 12.10's first paragraph's description of a refund of accumulations or capital accumulation payment as "due" points to another flaw in plaintiffs' interpretation. If a claim is necessary for a payment to become due, as plaintiffs contend, it would be nonsensical for the first

19

paragraph to provide for a situation when a refund or capital accumulation is due but no claim has been received. Similarly, it would be pointless for the second paragraph to provide for reversion to the Plan when a payment of monthly benefits is "due and payable" and the "payments due" still cannot be made because the member cannot be found. Under plaintiffs' approach, monthly payments would not be "due and payable" unless a member had come forward and requested payment. But if the member had come forward, the Plan administrator could simply pay the member. There would be no reason for reversion of anything to the Plan.

Plaintiffs contend that the reference in the second paragraph of section 12.10 to "retroactive payments from date of eligibility" is intended to refer to the general concept in the context of pensions that a member is eligible after meeting minimum age and service requirements. (E.g., *Alameda Sheriff's Assn.*, *supra*, 9 Cal.5th at p. 1056 ["In general terms, a county employee becomes *eligible* to retire after he or she has worked for the county for at least 10 years and has attained the age of 55" (italics added)].) However, we must interpret this Plan and section 12.10 specifically, not the terminology of other pension systems or pension law in general. As discussed *ante*, "date of eligibility" in section 12.10's second paragraph refers to the date on which "any payment of monthly benefits, refund, or a Capital Accumulation Payment is due and payable from the Plan." Because monthly payments are not payable, much less due, to a member until the member applies for them, the right to "retroactive payments from the date of eligibility" does not entitle a member to benefits any earlier than the date that the member applied for them.

The letter The Regents sent Graf in 2009 does not convince us to the contrary. The letter was intended to alert Graf to the fact that she could elect

20

benefits under the Plan and that for most members, the benefits would not increase after age 60. There is no indication that terminology in the letter was intended to carry the same technical meanings as terminology in the Plan itself. Nor did the letter tell Graf that benefits were "payable" to her as of age 60, as plaintiffs now contend section 12.10 mandates. Such a statement would have been strange, since it is undisputed that The Regents has never paid retroactive monthly benefits to members. The letter also told Graf that The Regents needed more information to determine how much was due to her, confirming that benefits are not and cannot be payable without a member's application.

Language aside, a larger problem with plaintiffs' approach is practical. Monthly benefits cannot be "payable" within the meaning of section 12.10 to a member where the member has not yet submitted an application and the precise amount due and the schedule for payment or payments have not yet been fixed. The Regents might reasonably disregard as unlikely the possibility that a member will choose a refund of accumulations instead of some retirement benefit, since a refund of accumulations would be much less beneficial than opting for retirement income. But there is also the possibility of a member choosing a lump sum cashout. If monthly benefits are payable when a member meets the minimum requirements of age 50, five years of service credit, and separation from University employment, a lump sum cashout would then be equally payable. Even though the basic retirement income might be viewed as the default option over the lump sum cashout, since the Plan describes it as "basic," it is by no means automatic, given that a member must file an application electing to receive it before the Plan will pay it. Moreover, even monthly benefits can vary in amount, since a member's monthly payment can either be the full basic retirement income

21

calculated by the formula set in section 5.06, or the member can choose from different combinations of lower payments to the member and correspondingly larger levels of payments to a contingent annuitant.

There is also the question of why The Regents should assume that a member who meets the minimum criteria would want to begin payments as early as age 50. While the Plan allows for retirement beginning at age 50, payments between ages 50 and 60 are actuarially equivalent, meaning a member's payments at age 60 are equivalent to the payments available at age 50, given certain assumptions about mortality and future inflation. The Regents therefore has no reason to undertake a search for each member immediately when the member meets the minimum age and other criteria. Making payments retroactive to the earliest age of eligibility when a member applies later could also thwart some members' desires. While there would be a lump sum of accumulated retroactive payments upon the member's application, payments after that date would have to continue at the lower rate applicable to the earlier age, rather than the higher monthly payments that section 5.06 would provide to a member who is older on the retirement date.

It is perhaps for this reason that in the trial court plaintiffs focused instead on arguing that age 60 is the date of eligibility, since at least at that point the age factor is capped. But as The Regents explains in detail in its brief, there are still many different scenarios in which members might benefit from delaying retirement past age 60. For example, members could still intend to return to University employment and hope to earn additional service credit and increase their highest average compensation. If a member begins receiving retirement income, the member would be subject to restrictions on rehiring retired members, such as work hours limitations and

22

annual demonstrations of need. Alternatively, members could also have reciprocity with PERS or STRS and need to retire at a later date to retire under both systems simultaneously and maximize their benefits under the Plan. In short, members may have good reasons to wait to claim retirement benefits, and The Regents cannot be expected to know in advance which members are strategically delaying retirement after age 60 and which are simply absentminded.

Plaintiffs refer to retroactive payments being due at a member's request and members always having the option of selecting a date of retirement after age 50, which might be assumed to fix the problem of The Regents requiring a member to take payments in a form or at a time that the member does not want. But nothing in section 12.10 suggests it was intended to permit elective retroactive payments. To the contrary, the second paragraph states that when a person entitled to payments that are "due and payable" comes forward and establishes the person's "entitlement," retroactive payments "*shall* be paid accordingly." (Italics added.) Besides, giving members such a choice could lead to other problems. Section 12.03 of the Plan mandates that elections for benefits are irrevocable once the Plan has made a payment. Plaintiffs' interpretation of section 12.10 would thwart this. The Plan's election requirements normally would require a member to choose between monthly benefits and a lump sum cashout, as well as between different monthly benefits options. These choices depend, among other things, on the member's expectations about whether the member could profitably invest the lump sum cashout, cost of living increases, and how much monthly income the member needs or wants. But if a member can simply defer the choice and obtain benefits retroactively at the member's

23

option, the member could effectively change to a different choice after the payments would otherwise have started.

This could have negative consequences. For example, a member might normally defer taking benefits in the expectation of having enough income from other investments and wanting to avoid paying higher taxes on higher income levels. But if the value of the member's other investments declined due to market conditions (conditions that might also affect Plan assets) and the member needed the income, plaintiffs' vision would allow the member to choose to receive benefits retroactively. While the impact on the Plan might be negligible from one member employing such a scheme, if large numbers of members simultaneously withdraw large sums retroactively, as might occur when financial markets decline, it could have a detrimental impact on the Plan.

Retroactive retirement could also skew actuarial assumptions that Plan benefits are based on. Without retroactive retirement, a member might choose to take a contingent annuitant option with lower monthly payments to the member on the assumption that the designated contingent annuitant would need additional income after the member's death. But if retroactive retirement were possible, the member could choose to wait. If the contingent annuitant were to die before the member, then the member could retroactively claim benefits at the full monthly amount, but if the contingent annuitant were still living, then the member could retroactively elect the contingent annuitant option, with greater assurance that the gamble would pay off. Such selective retroactivity could undermine the accuracy of the actuarial assumptions underlying Plan payments.

We recognize that pension provisions like section 12.10 of the Plan should be liberally construed to favor beneficiaries. (*Creighton*, *supra*, 58

Cal.App.4th at p. 244.) But this rule only applies when a provision is ambiguous. (*Ibid.*) Given the plain language of section 12.10 and its context in the Plan, as well as the history of its enactment and application, we do not find section 12.10 ambiguous. Nor does our interpretation claw back, forfeit, or impair any of plaintiffs' vested rights, as plaintiffs suggest. (E.g., *Alameda Sheriff's Assn.*, *supra*, 9 Cal.5th at p. 1076 [statutory pension plans "create implied contractual rights that are protected against legislative impairment by the contract clause" of the California Constitution (italics omitted)].) Plaintiffs only have a right to the pension that the Plan provides, and nothing in the Plan entitles members to payment of a pension based on a retroactive retirement date.

### C. History and purpose of section 12.10

Our analysis of section 12.10 and its context in the Plan as a whole is sufficient reason to reject plaintiffs' interpretation and affirm the trial court's judgment. However, we will briefly review section 12.10's history and purpose because it confirms our interpretation of the provision's text.

In 1977, The Regents was concerned about $70,000 of unclaimed mandatory refunds, then held in accounts payable status, escheating to the state under section 1521. Counsel advised adopting a forfeiture provision to address "all unclaimed" Plan funds, "whether payable to a Member, Retired Member, Beneficiary, Survivor, or Co-annuitant." Successive levels of staff proposals within The Regents repeated this recommendation and suggested the proposed language would provide for forfeiture "where a payee cannot be found." In November 1977, the Regents ultimately adopted the proposal as an amendment to the Retirement Manual. The relevant language of the 1977 provision is set forth in the margin, but it largely resembles the current

language in section 12.10.[6]  The Regents revised the language slightly over the ensuing years, in part to address the then-newly adopted lump sum cashout option and capital accumulation payments.

Section 12.10's origins as an anti-escheatment provision are illuminating.  The history of section 12.10 of the Plan makes clear that The Regents intended to prevent Plan payments from escheating to the state under Code of Civil Procedure former section 1521 when funds were payable or distributable but the payee could not be found.  While the forfeiture provision was intended to apply broadly to many categories of Plan payments, the unclaimed mandatory refunds that first sparked The Regents' concern illustrate the stage at which section 12.10 was intended to apply: when money was due to identifiable individuals, ready for payment and held

---

[6] The 1977 provision stated, "In any situation where monthly benefits are payable or a lump-sum distribution of Accumulations is due but no claim for such benefits or lump-sum distribution has been received, or where a refund of Member Accumulations is required but no request for refund has been received, or a refund cannot be made, a reasonable search, including mailing of a registered letter to the last known address, shall be made to ascertain the whereabouts of the eligible Participant, former Member, Eligible Survivor, or Beneficiary. [¶] If, at the end of the fiscal year following the fiscal year in which any payment of monthly benefits or refund is due and payable from the Retirement Plan or the Tax-Deferred Annuity Plan, such search remains unproductive and the payments due still cannot be made, such amounts and the reserves, if any, related thereto shall revert to the applicable Plan.  If the person or persons entitled thereto shall thereafter come forward requesting payment and establish such entitlement, the amounts then due, including retroactive payments from date of eligibility, shall be paid accordingly and, if needed, reserves for future payments reestablished. [¶] If, within five years from his Compulsory Retirement Date, no evidence has been obtained as to the whereabouts of an Inactive Member or Inactive Limited Member, it shall be presumed for all purposes of the System that said Participant died on the day preceding his Compulsory Retirement Date, and benefits shall be paid accordingly."

26

in accounts payable until the recipient could be located. There is no suggestion that The Regents intended to permit members to retroactively select a retirement date, which is how plaintiffs now interpret the provision. If that were The Regents' intent, it would far more likely have directly amended the provisions governing the selection of a retirement date or the definition of retirement income.

The Regents' history of performance after adopting the provision that is now section 12.10 further supports this view. Only 5 to 10 members request retroactive payments per year. Plaintiffs do not dispute that since 1977, The Regents has never paid retroactive monthly benefits based on a retirement date that pre-dates a member's application for benefits as plaintiffs request here. If section 12.10 were intended to operate as plaintiffs contend, it is likely that The Regents would have applied it in that fashion decades ago. That The Regents has never interpreted the Plan in this way suggests that plaintiffs' interpretation is incorrect.[7]

## II. Breach of Fiduciary Duty

Separate from their challenge to the trial court's summary adjudication ruling that disposed of their breach of contract claim, plaintiffs also challenge the trial court's ruling in favor of The Regents following a bench trial on plaintiffs' claim for breach of fiduciary duty. Plaintiffs contend the trial court made two legal errors: applying the wrong standard and relying on impermissible evidence. We are not convinced.

---

[7] Because we independently conclude section 12.10 does not support plaintiffs' contract claim, we need not address The Regents' additional contention that we should defer to its interpretation of the Plan.

## A. Additional Background

According to its statement of decision, at the second phase of trial the court considered "whether the actions of The Regents 'fully and fairly' informed a 'reasonable plan beneficiary' about their retirement options under the Plan." As the trial court explained, it used this standard because of *Hittle v. Santa Barbara County Employees Retirement Assn.* (1985) 39 Cal.3d 374, 394 (*Hittle*), which stated that a plan trustee could meet its fiduciary disclosure duties by providing a booklet or other materials describing the plan and its various options and thereafter referring the member to the booklet. The trial court reasoned that a plan trustee could also effectively communicate plan terms through other available media such as information provided through the Internet, person-to-person meetings, telephonic communications and webinars, and information posted on the Internet.

After reviewing the evidence from the trial, the trial court concluded that plaintiffs had failed to prove The Regents breached its duty of disclosure by failing to communicate information that was complete, accurate, and fairly informed plan members of their retirement options. The court said that in hindsight it might have been desirable to include language in Plan documents stating that retirement benefits would not be paid retroactively. But the court said this presupposed that there was language in the Plan suggesting that benefits were payable retroactively. The trial court declared, "The Plan documents contain no such language." The trial court quoted *Hittle*'s statement that if a plan "booklet *fully and fairly describes* the plan and its various options and procedures, and copies are made available, the obligation of the trustees toward a terminating employee [to inform him of his option to apply for disability retirement] may be satisfied." (*Hittle, supra,* 39 Cal.3d at p. 394, italics added by trial court.) The trial court then found,

28

"The Plan documents, in conjunction with other information and resources provided to Plan members, taken together, were sufficient to discharge The Regents' fiduciary duties to the Plan members."

The trial court went on to say that it had "considered evidence related to the efficaciousness of the [Plan] publications, member correspondence and other media in informing members." The trial court summarized that evidence and concluded that it "strongly suggest[ed] that the Plan documents and related correspondence and communications and the efforts of The Regents to communicate the terms of the [Plan] to its members were extremely effective."

Near the end of its discussion of the question of breach, the trial court remarked, "In considering the 'fully and fairly' standard as applied to a 'reasonable plan beneficiary,' the court has considered the case law on class notice after a court has certified a class." The trial court observed that the plaintiff in a class action has a fiduciary duty to class members. The court cited and discussed several cases that held that a notice to a class must be " ' "the best practicable, 'reasonably calculated, under all the circumstances,' " ' " to provide the requisite notice and that "the standard 'is whether the notice has "a reasonable chance of reaching a substantial percentage of the class members." ' " (*Duran v. Obesity Research Institute, LLC* (2016) 1 Cal.App.5th 635, 647–648; see also *Chavez v. Netflix, Inc.* (2008) 162 Cal.App.4th 43, 49, 53; *Zimmer Paper Products, Inc. v. Berger & Montague, P.C.* (3rd Cir. 1985) 758 F.2d 86, 90–93.) But the trial court declared that it considered the effectiveness of The Regents' disclosures "by analogy to the effectiveness of notice and claims procedures in class actions." The court then restated the "fully and fairly inform" fiduciary standard and

29

declared that a retirement plan trustee does not have a fiduciary duty to maximize benefits for each individual plan member.

## B. Analysis

"On appeal from a judgment based on a statement of decision after a bench trial, we review the court's legal conclusions de novo and its findings of fact for substantial evidence." (*Petree v. Public Employees' Retirement System* (2024) 106 Cal.App.5th 585, 590.)

Plaintiffs contend first that the trial court applied the wrong legal standard by relying on class action cases that, they contend, establish a lower standard than *Hittle*. However, the trial court was clear that *Hittle*'s "fully and fairly inform" standard governed, and the court referred to that standard repeatedly throughout its statement of decision. Before discussing the class action cases, the trial court found that The Regents met the *Hittle* standard because the evidence showed that the Plan documents and The Regents' other communications and resources accurately described the Plan. The trial court also concluded that The Regents was only required to inform a reasonable plan beneficiary, not reach each and every member of the class. After making these findings, the court referred to the class action context only "by analogy" as additional support on the narrow point of whether The Regents' communications needed to reach every member. It then reaffirmed the *Hittle* standard after discussing class actions. The trial court's view that the holdings in class action cases were consistent with its view that The Regents' communications were sufficient despite not reaching all members does not mean the trial court erroneously applied the class action standard instead of *Hittle* to find The Regents discharged its fiduciary duty.

Plaintiffs also argue that the trial court committed a legal error by relying on the availability of websites, call centers, and counselors to find The

Regents met its duty. They point out that *Hittle* stated that the omission of information about a disability retirement option from a form and form letter sent to a plan member "was not remedied by the form letter's invitation to retiring employees to contact the [retirement association] if any additional information is required." (*Hittle, supra,* 39 Cal.3d at p. 394.) But *Hittle* first found the retirement association misrepresented or concealed information by omitting it from its communications. (*Hittle, supra,* 39 Cal.3d at pp. 393– 394.) Only then did the court remark that the association's invitation to contact it did not cure the misrepresentation. (*Id.* at p. 394.) By contrast, the trial court here did not find that the Plan documents or The Regents' communications were deficient in any way. As the court explained, the question for the trial was whether The Regents took sufficient steps to disabuse members of an unfounded assumption that retroactive benefits were possible. The trial court found The Regents did not breach its duty because nothing in the Plan stated that retroactive benefits were possible, the Plan documents and letters sent to members said that there was generally no advantage to delaying retirement past age 60, vanishingly low percentages of members ever asked for retroactive benefits, and The Regents did not have a duty to maximize benefits for each member. The trial court did not rely improperly on the availability of Plan websites and counselors to cure otherwise misleading or concealing disclosures from The Regents.[8]

---

[8] After finding The Regents did not breach its fiduciary duty, the trial court spent five pages explaining why, even if it did breach its duty, the court could not order the relief plaintiffs requested. (See *City of Pleasanton v. Board of Administration* (2012) 211 Cal.App.4th 522, 544 [pension system board could not be required to pay benefits greater than statute allowed, either by estoppel or as tort damages for breach of fiduciary duty].) However, the trial court expressly stated that it was not relying on this rationale to rule in favor of The Regents. The Regents offers this as an alternative basis

31

## DISPOSITION

The judgment is affirmed.

---

for affirmance.  We need not and do not reach this issue because we agree with the trial court that The Regents did not breach its fiduciary duty.

BROWN, P.J.

We concur:


GOLDMAN, J.


CLAY, J.*


*Mass et al. v. Board of Regents of the University of California et al.* (A170402)


      \* Judge of the Alameda Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Trial Court:                          Alameda County Superior Court

Trial Judge:                          Hon. Evelio M. Grillo


Attorneys for Plaintiffs
and Appellants:                       Renaker Scott
                                      Kirsten Gibney Scott

                                      Altshuler Berzon
                                      Max M. Carter-Oberstone
                                      Michael Rubin

                                      Nichols Kaster
                                      Matthew C. Helland
                                      Daniel Brome

                                      Paul J. Lukas
                                      Brock J. Specht
                                      Benjamin J. Bauer


Amicus Curiae on behalf
of Plaintiffs and Appellants:         Pension Rights Center
                                      Keller Rohrback
                                      Jeffrey Lewis
                                      Erin M. Riley


Attorneys for Defendants
and Respondents:                      O'Melveny & Myers
                                      Aaron Henson

                                      Meaghan VerGow
                                      Shannon Barrett